1

**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:     (619) 798-2006

2

3

4

5

**Counsel for Plaintiff**

6

7

**UNITED STATES DISTRICT COURT**

8

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9

10

11

12

JASON FERGUSON, on behalf of himself
and all others similarly situated,

13

14

Plaintiff,

15

v.

16

WALGREEN CO.,

17

Defendant.

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:25-cv-08299-JST
Pleading Type: Class Action

**FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF:**

**THE UNFAIR COMPETITION LAW,
THE FALSE ADVERTISING LAW, AND
THE CONSUMER LEGAL REMEDIES ACT**

**No Jury Demand**

# **TABLE OF CONTENTS**

I.      JURISDICTION AND VENUE ................................................................................1

II.     DIVISIONAL ASSIGNMENT.................................................................................1

III.    NATURE OF THE ACTION ...................................................................................1

IV.     PARTIES ................................................................................................................3

V.      BACKGROUND ON UNAPPROVED "TESTERONE BOOSTING" DRUGS .............3

VI.     REGULATORY BACKGROUND ...........................................................................5

VII.    THE SALE OF UNAPPROVED DRUGS HARMS THE PUBLIC...............................6

VIII.   TESTOFEN DOES NOT EFFECTIVELY INCREASE TESTOSTERONE. ....................7

IX.     TESTOSTERONE   COMPLEX'S   SPECIFIC   MISREPRESENTATIONS, MATERIAL OMISSIONS, AND DRUG CLAIMS. ....................................................8

X.      TESTOSTERONE COMPLEX IS AN UNAPPROVED NEW DRUG. ..........................11

XI.     DEFENDANT'S PRACTICES WERE "UNFAIR" WITHIN THE MEANING OF THE UNFAIR COMPETITION LAW ....................................................................13

XII.    DEFENDANT'S PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW. .................................................14

XIII.   PLAINTIFF'S PURCHASE OF TESTOSTERONE COMPLEX ...................................15

XIV.    RELIANCE AND INJURY....................................................................................16

XV.     CLASS ACTION ALLEGATIONS .........................................................................16

CAUSES OF ACTION................................................................................................18

PRAYER FOR RELIEF ..............................................................................................22

NO JURY DEMAND..................................................................................................22

Plaintiff Jason Ferguson, on behalf of himself, all others similarly situated, and the general public, by and through his undersigned counsel, hereby sues Defendant Walgreen Co. ("Walgreens" or "Defendant") and upon information and belief and investigation of counsel, alleges as follows:

## I.    JURISDICTION AND VENUE

1.    The Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and because more than two-thirds of the members of the class defined herein reside in states other than the state of which Defendant resides.

2.    Venue is proper under 28 U.S.C. § 1391 because Plaintiff resides and suffered injuries in this District as a result of Defendant's conduct in this District; many of the acts and transactions giving rise to this action occurred in this District; and Defendant (1) is authorized to conduct business in this District, and has intentionally availed itself of the laws and markets of this District through the distribution and sale of its products in this District; and (2) is subject to personal jurisdiction in this District.

## II.    DIVISIONAL ASSIGNMENT

3.    This civil action arises, in part, out of the events and omissions of Defendant, which occurred, in part, in San Fransico County, California. Pursuant to Civil Local Rule 3-2(c), this action is properly assigned to the San Francisco/Oakland Division.

## III.    NATURE OF THE ACTION

4.    During the class period, Walgreens marketed, distributed, and sold Walgreens Men's Testosterone Complex ("Testosterone Complex"). Defendant claims that Testosterone Complex "boost[s] free testosterone levels," "promotes an increase in free testosterone levels," increases "lean muscle mass, strength, & endurance," and improves "sexual function in men." Walgreens further claims that the product "has been clinically studied" and is "Walgreens pharmacist recommended."

5.     These claims were misleading, as none of the ingredients in Testosterone Complex, individually or in combination, safely and effectively increase testosterone or strength or improve sexual performance.

6.     In truth, Testosterone Complex is entirely ineffective.

7.     Further, Walgreens aggressively markets and sells Testosterone Complex with false and deceptive efficacy claims which suggest the product has medical benefits akin to prescription drugs, hormone therapies, and aphrodisiac drugs.

8.     These claims are prohibited by the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*. ("FDCA"), and subject any individual manufacturing or selling it to liability for the sale of an unapproved new drug.

9.     Defendant's representations mislead consumers into believing that Testosterone Complex is legal, safe, and effective for its intended purposes.

10.     Plaintiff Jason Ferguson purchased Testosterone Complex (1) in reliance on Defendant's deceptive efficacy claims (2) with the belief that the product was safe, (3) was effective, and (4) was sold in compliance with state and federal regulations.

11.     Mr. Ferguson used Testosterone Complex as directed, but the product failed to deliver the advertised benefits, nor any results at all.

12.     This action is brought to remedy Defendant's fraudulent, unfair, and unlawful conduct. On

behalf of the class defined herein, Plaintiff seeks an order compelling Walgreens to, *inter alia*: (1) cease marketing and selling Testosterone Complex as an illegal unapproved new drug; (2) conduct a corrective advertising campaign; (3) destroy all unlawful products and labeling; (4) award Plaintiff and the Class members restitution and damages; and (5) pay costs, expenses, and attorney fees.

## IV.    PARTIES

13.    Defendant Walgreen Co. is an Illinois corporation with its principal place of business in Deerfield, Illinois.

14.    During the class period, Walgreen Co. owned, contracted for the manufacturing, marketed, distributed, and sold Testosterone Complex. Defendant marketed Testosterone Complex with illegal drug claims that deceptively promised prescription anabolic and aphrodisiac drug effects.

15.    Plaintiff Jason Ferguson is a citizen and resident of California who purchased Testosterone Complex during the class period for personal consumption.

## V.    BACKGROUND ON UNAPPROVED "TESTERONE BOOSTING" DRUGS

16.    The

Dietary Supplement Health and Education Act (DSHEA) of 1994, which amended the Federal Food, Drug, and Cosmetic Act, transformed FDA's authority to regulate dietary supplements. Under DSHEA, **FDA is not authorized to approve dietary supplements for safety and effectiveness before they are marketed**. In fact, in many cases, firms can lawfully introduce dietary supplements to the market without even notifying FDA. Since DSHEA was enacted, the dietary supplement market has grown significantly. For example, the number of products has expanded nearly twenty times since 1994.[1]

17.    A January 2020 evaluation of 'Testosterone Boosting' supplements, published by the National Library of Medicine found that

[a]pproximately 50% of American adults consume dietary supplements to promote overall health and fill dietary gaps [4,5]. These over the counter "T boosters" are often taken with the hopes of raising endogenous [testosterone] production and doing this in a more "natural"

---

[1] U.S. Food & Drug Admin., Information for Consumers on Using Dietary Supplements (October 21, 2022), available at www.fda.gov/food/dietary-supplements/information-consumers-using-dietary-supplements.

manner.[2]

18.    The evaluation further found that "[n]inety percent of 'T booster' supplements claimed to boost [testosterone]," and of these products, just "24.8% of these had data to support these claims." *Id.*

19.    Further the same study found 10.1% of supplements "contained components with data suggesting a negative effect" on testosterone and insisted that "[p]atients should be informed that 'T booster' supplements may not have ingredients to support their claims." *Id.*

20.    In February 2019, the Journal of Sexual Medicine published a study titled *Testosterone Imposters: An Analysis of Popular Online Testosterone Boosting Supplements,* which examined the influence Defendant and similar companies have on the online supplement market.[3]

21.    This study found:

The growing role of the internet, combined with the receptiveness of many men to pursuing therapies that influence testosterone levels, emphasizes the importance of understanding T-Boosters hosted on Amazon.com.

*Id.*

22.    Although the study found that "T-Boosters are easily available online," the "investigation revealed that limited human studies have evaluated T-Boosters, resulting in no definitive findings of efficacy," and additionally warned that "[i]**n the absence of additional human studies, patients should be cautioned before considering T-Boosters, given the availability of highly effective therapies approved by the Food and Drug Administration.**" *Id.* (emphasis added).

23.    Moreover, consumption of over-the-counter "natural" or "herbal" purported testosterone boosters presents significant health risks. First, consumers risk purchasing and using a product that will endanger their health. Second, consumers risk purchasing a product that will not effectively treat their condition, forgoing actual treatment of that condition in lieu of an unapproved new drug which may not treat their condition.

24.    A 2017 case report examining a patient who had consumed one such purported "natural" testosterone booster found "[t]he risk of venous thromboembolic events is" "unclear with non-FDA-

---

[2] Glemesha, Chase (2020) '*Testosterone Boosting' Supplements Composition and Claims Are Not Supported by the Academic Literature*; WORLD J. MEN'S HEALTH 2020 Jan 38(1): 115-122.

*Available at* www.ncbi.nlm.nih.gov/pmc/articles/PMC6920068/.

[3] Balasubramanian, et al. *Testosterone Imposters: An Analysis of Popular Online Testosterone Boosting Supplements*, 16 J. SEXUAL MEDICINE 203-12 (Feb. 2019).

*Available at* www.sciencedirect.com/science/article/pii/S1743609518313821.

approved herbal supplements marketed as testosterone enhancers."[4]

25.     The study noted that:

Decreased testosterone levels in men are often a normal sign of aging. Testosterone replacement therapy (TRT) is a well-established option for those with symptomatic hypogonadism related to low testosterone levels. Conversely, designer herbal supplements in the context of testosterone supplementation are poorly studied, yet remain popular among aging men who seek the well-known, often enhancing, effects of testosterone that involve muscle mass and sexual function/drive.

26.     The study further noted that

[i]n 2014, the Food and Drug Administration (FDA) issued a warning about the significant risk of venous clots secondary to testosterone product use. Testosterone-induced polycythemia is one of the proposed mechanisms for this increased clotting propensity. Increased thromboxane A2 receptor density on platelets and increased platelet aggregation have also been linked to testosterone treatment in men.

27.     Thus, there is "is an inherent risk for vascular events, such as pulmonary embolus, in testosterone supplement use." *Id.*

## VI.    REGULATORY BACKGROUND

28.     "The term 'drug' means . . . (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1).

29.     A "new drug" is any drug "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the condition prescribed, recommended, or suggested in the labeling thereof . . . ." 21 U.S.C. § 321(p)(1).

30.     Pursuant to 21 U.S.C § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug . . ." without approval by the FDA.

---

[4] Nguyen S M, Ko Ko N, Sattar A S, et al. (August 06, 2017) *Pulmonary Embolism Secondary to Testosterone-Enhancing Herbal Supplement Use*. Cureus 9(8): e1545. DOI 10.7759/cureus.1545. *Available at* pubmed.ncbi.nlm.nih.gov/29018642/.

31.     Further, 21 U.S.C. § 331(a) prohibits the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded."

32.     Under 21 U.S.C. § 352(f), drugs are required to have adequate instructions for safe use.

33.     Pursuant to 21 C.F.R. § 310.528,

> Any product that bears labeling claims that it will arouse or increase sexual desire, or that it will improve sexual performance, is an aphrodisiac drug product . . . Any OTC drug product that is labeled, represented, or prompted for use as an aphrodisiac is regarded as a new drug within the meaning of section 201(p) of the Federal Food, Drug, and Cosmetic Act

## VII.    THE SALE OF UNAPPROVED DRUGS HARMS THE PUBLIC.

34.     "Unapproved prescription drugs pose significant risks to patients because they have not been reviewed by FDA for safety, effectiveness or quality."[5]

35.     "Without FDA review, there is no way to know if these drugs are safe and effective for their intended use, whether they are manufactured in a way that ensures consistent drug quality or whether their label is complete and accurate." *Id.*

36.     "Unapproved drugs have resulted in patient harm, and the [FDA] works to protect patients from the risks posed by these drugs." *Id.*

37.     Unapproved drugs lack "labels and prescribing information that has" "been reviewed by FDA for accuracy and completeness."[6]

38.     Consumers using unapproved drugs run the risk of "unexpected and undocumented safety concerns due to lack of rigorous pre- and postmarket safety surveillance." *Id.*

39.     Additionally, unapproved drugs lead consumers in need of medical treatment to forego medically proven therapies.

---

[5] U.S. Food & Drug Admin., <u>Unapproved Drugs</u> (June 2, 2021), available at www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs.

[6] U.S. Food & Drug Admin., Unapproved Drugs and Patient Harm (June 2, 2021), www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs-and-patient-harm.

# VIII. TESTOFEN DOES NOT EFFECTIVELY INCREASE TESTOSTERONE.

40.    On its website, Defendant claims that "Walgreens Men's Testosterone Complex is powered by Testofen, a unique standardized fenugreek extract that is recognized for hormone support."[7]

41.    However, Testofen, the purported active ingredient in the product, does not increase testosterone.

42.    A human clinical trial conducted in Australia comparing Testofen to placebo found that Testofen "did not affect testosterone" levels.[8]

43.    Another study concluded that fenugreek extract has no effect on free testosterone levels:

Despite no substantiated claims in human research models, fenugreek has been marketed in dietary products as having anabolic potential for resistance trained athletes. . . . The purpose of this study was to investigate the potential anabolic effects of fenugreek extract supplementation in conjunction with a controlled resistance training program. . . . No significant effects for groups or interactions were observed for the anabolic hormone[] free testosterone . . . (p<0.05). . . . [S]upplementation of fenugreek extract does not appear to affect hormonal status in resistance trained males and shows no anabolic potential as has been purported.[9]

44.    An additional study examining the effects of fenugreek extract versus placebo on testosterone levels concluded that "No significant changes were detected among groups for . . . free testosterone."[10]

45.    Another study found a significant difference in free testosterone levels between the group taking fenugreek extract and the placebo group, but the difference was *in favor of the placebo group,* whose free testosterone levels rose by an average of 10 ng/ml over the course of the study, compared to

---

[7] Walgreen Co., Walgreens Mens Testosterone Complex, available at walgreens.com/store/c/walgreens-men%27s-testosterone-complex-tablets-(60-days)/ID=300401155-product (last visited December 1, 2025).

[8] E. Steels, et al., *Physiological Aspects of Male Libido Enhanced by Standardized Trigonella foenum-graecum Extract and Mineral Formulation*, PHYTOTHERAPY RES. 25: 1294-1300 (2011).

[9] B. Bushey, et al., *Fenugreek Extract Supplementation Has No Effect on the Hormonal Profile of Resistance-Trained Males*, INT. J. EXERC. SCI. 2(1): S13, 2009

[10] C. Poole, et al., *Effects of TESTOSURGE supplementation on strength, body composition and hormonal profiles during an 8-week resistance training program*, J. INT. SOC. SPORTS NUTRITION 2009, 6(Suppl. I): P12

the fenugreek group, whose free testosterone levels declined by an average of 4 ng/ml.[11]

46.    Rather than finding a negative effect on free testosterone levels, the study concluded that fenugreek extract has no effect:

> Fenugreek supplementation is surrounded by assertions of having anabolic potential, even though there is no scientific data supporting this notion. In the present study we examined serum hormone variables that included free testosterone . . . . Although a between group difference was noted for free testosterone at T2 and T3, it has limited relevance due to the fact that it did not significantly change over time. . . . [D]aily consumption of the 500 mg commercially available [fenugreek] supplement in conjunction with a resistance training program has no anabolic effect on the hormonal status of resistance trained males.

*Id.*

47.    Another review noted that

> In terms of fenugreek as a TRT supplement, in one clinical study, fenugreek (standardized to 70 % trigimannose) actually significantly reduced levels of free testosterone [218]. Men had a 40 ng/ml free testosterone at baseline, reduced to 33 ng/ml at 4 weeks, and then to 36 ng/ml at 8 weeks ( p ¼ 0.02) when taking 500 mg per day. DHT levels were reduced in the fenugreek group. Other studies demonstrate that fenugreek either causes no change or slightly increases testosterone in men have been for those with an already normal testosterone at baseline.[12]

## IX.    TESTOSTERONE COMPLEX'S SPECIFIC MISREPRESENTATIONS, MATERIAL OMISSIONS, AND DRUG CLAIMS.

### A.    Testosterone Complex's Packaging

48.    During the class period, Defendant Walgreens marketed Testosterone Complex with deceptive efficacy claims that suggest that the product can affect the structure or function of the human body by increasing testosterone levels, strength, and sexual performance, and cure, mitigate, or treat disease, such as low testosterone, hormonal imbalance, and sexual dysfunction.

49.    These claims are misleading, as none of the ingredients in Testosterone Complex, either individually or in combination, can increase testosterone levels or strength or improve sexual performance.

---

[11] C. Poole, et al., *The effects of a commercially available botanical supplement on strength, body composition, power output, and hormonal profiles in resistance-trained males*, J. Int. Soc. Sports Nutrition 2010, 7:34

[12] J. Mulhall, *Men's Sexual Health and Fertility: A Clinician's Guide*, Springer (2014), available at tinyurl.com/mrn83djw.

50.     These claims also render Testosterone Complex a "drug" within the meaning of 21 U.S.C. § 321(g) and an aphrodisiac drug within the meaning of 21 C.F.R. § 310.528.

51.     However, Walgreens failed to obtain FDA approval to market and distribute these drugs in violation 21 U.S.C. § 355 and Health & Safety Code § 111550.

52.     The packaging and label of Walgreens Men's Testosterone Complex packaging is pictured below.



*Ferguson v. Walgreen Co.*, Case No. 3:25-cv-08299-JST
FIRST AMENDED CLASS ACTION COMPLAINT



53.    During the Class Period, the label claimed the product "boost[s] free testosterone levels," "promotes an increase in free testosterone," increases "lean muscle mass, strength, & endurance," and improves "sexual function in men." Walgreens further claims it "has been clinically studied" and is "Walgreens pharmacist recommended."

54.    Testosterone Complex does not deliver the advertised benefits.

55.    These efficacy claims, in addition to being misleading, render original Testosterone Complex a "drug" as defined by 21 U.S.C. § 321(g) and an "aphrodisiac drug" as defined by 21 C.F.R. § 310.528.

**B.    Walgreens.com Product Page for Testosterone Complex**

56.    Walgreens advertises Testosterone Complex with further deceptive efficacy claims online

10

that suggest the product can provide prescription steroid and aphrodisiac drug benefits.

57.     The Testosterone Complex label and Defendant's website, walgreens.com, contained the following claims, which show that the product is intended to affect the structure and function of the body, and to cure, mitigate, treat, or prevent disease, during the Class Period:

- "Testosterone Complex"
- "Increase in Free Testosterone"
- "healthy libido"
- "lean muscle mass, strength, & endurance"
- "As men age, they are able to use less and less of the testosterone that their bodies produce. This can be felt by the aging male in areas such as strength, libido, muscle endurance—and a general 'less than prime' feeling."
- "Testofen has been clinically studied for its ability to:
  - Support the development of lean muscle mass
  - Support muscle strength & endurance
  - Boost free testosterone levels
  - Support sexual function in men"
- "Walgreens pharmacist recommended"

58.      These claims suggest Testosterone Complex can treat low testosterone, hormonal imbalance, and sexual dysfunction, and affect the structure and function of the human body by increasing testosterone, muscle mass, and libido. However, Testosterone Complex fails to deliver the advertised benefits.

59.     Further, these claims render Testosterone Complex a "drug" within the meaning of 21 U.S.C. § 321(g)(1) and an aphrodisiac drug within the meaning of 21 C.F.R. § 310.528.

60.     True and correct copies of screenshots of the Testosterone Complex page from Defendant's website, walgreens.com, are attached hereto as **Exhibit 1.**

61.     Walgreens failed to obtain FDA approval prior to marketing, distributing, and selling Testosterone Complex.

## X.      TESTOSTERONE COMPLEX IS AN UNAPPROVED NEW DRUG.

62.     "The term 'drug' means . . . (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to

affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1).

63.    Here, Testosterone Complex is a "drug" because it is advertised as a product which will affect the structure or function of the body and cure, mitigate, treat, or prevent disease.

64.    The claims on the packaging of Testosterone Complex and Walgreens.com product page for Testosterone Complex render the product an unapproved new drug.

65.    The FDA has determined that the following claims, which are similar to those Defendant made regarding Testosterone Complex constitute "drug claims":

- "Natural testosterone booster" (**Exhibit 2**, FDA Warning Letter to Unlimited Nutrition);

- "[I]ncrease estrogen and testosterone levels" (**Exhibit 3**, FDA Warning Letter to Star Health & Beauty, LLC);

- "Increase Lean Muscle Mass" (**Exhibit 3**);

- "Highly anabolic" (**Exhibit 4**, FDA Warning Letter to AndroPharm, LLC);

- "Increase Muscle Mass" (**Exhibit 4**);

- "Activate Numerous Anabolic Pathways" (**Exhibit 4**);

- "Explosive Muscle & Strength Gains" (**Exhibit 4**);

- "100% Natural Male Performance Booster" (**Exhibit 5**, FDA Warning letter to Distributor RFR, LLC);

- "In just 30 minutes or less after consumption you will feel its effect, more energy, more sexual desire and more power." (**Exhibit 5**);

- "a male enhancement supplement that improves sexual performance" (**Exhibit 6**, FDA Warning letter to Umbrella);

- "no prescription needed male enhancement supplement that improves sexual performance as well as proven natural solution for erectile dysfunction" (**Exhibit 6**).

66.    A "new drug" is any drug "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the condition prescribed, recommended, or suggested in the labeling thereof . . . ." 21 U.S.C. § 321(p)(1). Here, Testosterone Complex is a "new drug" within the meaning of the FDCA because it is not generally recognized as safe and effective for the intended uses. See Title 21 of the Code of Federal Regulations, Chapter I, Subchapter D; 21 C.F.R. § 330.1.

67.    Defendant has not received approval from the FDA to sell Testosterone Complex.

68.    The sale of unapproved new drugs is illegal and dangerous. First, consumers risk

12

purchasing and using a product that will endanger their health. Second, consumers risk purchasing a product that will not effectively treat their condition, forgoing actual treatment of that condition in lieu of an unapproved new drug which may not treat their condition. The FDA's regulatory regimen helps ensure that such products are kept away from consumers.

69.    Defendant's failure to comply with these regulations puts consumers at risk and gives Walgreens an unfair advantage over competitors that do commit the time and expense of complying with such necessary regulations.

70.    Testosterone Complex does not qualify for the reduced level of regulation applicable to certain nutrition supplement products for several reasons. The Testosterone Complex label, Walgreens's website, and Walgreens's marketing materials neither describe the role of any nutrient or dietary ingredient intended to affect the structure or function in humans, characterize the documented mechanism by which any nutrient or dietary ingredient acts to maintain such structure or function, nor describe general well-being from consumption of any nutrient or dietary ingredient. 21 U.S.C. § 343(r)(6)(A).

71.    California similarly prohibits the sale of unapproved new drugs. Health & Safety Code § 111550.

## XI.    DEFENDANT'S PRACTICES WERE "UNFAIR" WITHIN THE MEANING OF THE UNFAIR COMPETITION LAW.

72.    Defendant's practices as described herein are "unfair" within the meaning of the California Unfair Competition Law because Walgreens's conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers, and the utility of this conduct to Defendant does not outweigh the gravity of the harm to Defendant's victims.

In particular, while Defendant's marketing of Testosterone Complex with deceptive efficacy and "drug" claims as defined by 21 U.S.C. § 321(g) and "aphrodisiac drug" claims as defined by 21 C.F.R. § 310.528 and absent FDA approval to do so allowed Walgreens to realize higher profit margins than if it did not use unlawful marketing tactics, this utility is small and far outweighed by the gravity of the economic harm and potential physical harm that Defendant inflicts upon consumers. Further, the injury to consumers from Defendant's practices is substantial, not outweighed by benefits to consumers or competition, and

not an injury that consumers themselves could reasonably have avoided.

## XII.    DEFENDANT'S PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW.

73.    Defendant's practices as described herein are "unlawful" within the meaning of the California Unfair Competition Law because the marketing, sale, and distribution Testosterone Complex violate the California's Sherman Food, Drug, and Cosmetic Law, including federal provisions that have been adopted by California

- **Health & Safety Code § 110100 *et seq.***, which adopts all FDA labeling regulations as state regulations;

- **Health & Safety Code § 111330**, "Any drug or device is misbranded if its labeling is false or misleading in any particular.";

- **Health & Safety Code § 110398**, "It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.";

- **Health & Safety Code § 111440**, "It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is misbranded.";

- **Health & Safety Code § 111445**, "It is unlawful for any person to misbrand any drug or device.";

- **Health & Safety Code § 111450**, "It is unlawful for any person to receive in commerce any drug or device that is misbranded or to deliver or proffer for delivery any drug or device.";

- **Health & Safety Code § 111550**, prohibiting sale of new drugs unless approved under 21 U.S.C. § 355;

- **21 U.S.C. § 331(a)**, prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded";

- **21 U.S.C. § 331(b)**, prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce";

- **21 U.S.C. § 352(f)(1)**, requiring drugs to have adequate directions for use;

- **21 U.S.C. § 355(a)**, prohibiting the sale of unapproved new drugs; and

- **21 C.F.R. § 310.528**, prohibiting the sale of unapproved aphrodisiac drugs

74.    The fraudulent marketing and advertising of Testosterone Complex also violates the CLRA and False Advertising Law and further constitutes a violation of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

75.     Defendant's unlawful acts allowed it to sell more units of Testosterone Complex than it would have otherwise, and at a higher price and higher margin.

76.      In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and requiring Defendant to commence a corrective advertising campaign.

77.     Plaintiff also seeks an order for the disgorgement and restitution of all revenue received by Defendant from the sale of Testosterone Complex and has no adequate remedy at law.

78.     Walgreens's unlawful and deceptive marketing and advertising of Testosterone Complex constitutes a violation of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

79.     Defendant's unlawful acts allowed it to sell more units of Testosterone Complex than it would have otherwise, and at a higher price and higher margin.

80.     In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

81.     Plaintiff also seeks an order for the disgorgement and restitution of all revenue received by Defendant from the sale of Testosterone Complex.

## XIII.   **PLAINTIFF'S PURCHASE OF TESTOSTERONE COMPLEX**

82.     Plaintiff Jason Ferguson purchased Testosterone Complex at least three times from the Walgreens locations on Market Street in San Francisco and on East Avenue in Chico. His most recent purchase was in or about December 2023.

83.     In deciding to purchase Testosterone Complex, Plaintiff relied on Defendant's deceptive efficacy representations and fraudulent omissions.

84.     Plaintiff used Testosterone Complex as directed, but the product failed to deliver the advertised benefits, nor any results at all.

85.     Because Plaintiff expected these statements to be true and honest, but they were not, he did not receive the benefit of his purchase.

1

## XIV.    RELIANCE AND INJURY

2      86.    Plaintiff purchased and used Testosterone Complex in reliance on Defendant's deceptive

3  efficacy representations described herein and would not have purchased the product absent Defendants'

4  deceptive advertising.

5      87.    When Plaintiff purchased Testosterone Complex, he was seeking a safe and effective

6  product which would increase testosterone levels, muscle mass, and libido, and which was sold in

7  compliance with FDA regulations and California law.

8      88.    Plaintiff purchased Testosterone Complex with the natural assumption that products sold

9  in stores and online by large companies would deliver the advertised benefits and would be sold in

10  compliance with FDA regulations and California law.

11      89.    Plaintiff suffered economic injury when he purchased Testosterone Complex because the

12  product was entirely ineffective for its intended purposes and was in violation of federal regulations and

13  California law.

14      90.    Plaintiff would not have purchased Testosterone Complex had he known that it was entirely

15  ineffective for its intended purposes and was sold in violation of federal regulations and California law

16      91.    Testosterone Complex was offered for sale in violation of California and federal law and

17  had a value of $0 because it is both illegal and ineffective.

18      92.    Plaintiff would consider purchasing Testosterone Complex in the future if he could be

19  assured that the product (1) would deliver the advertised benefits, (2) was safe and effective, and (3) was

20  sold in compliance with all FDA regulations and California law.

21

22

## XV.    CLASS ACTION ALLEGATIONS

23      93.    Plaintiff brings this action on behalf of himself and all others similarly situated (the

24  "Class"), excluding Defendant's officers, directors, and employees, and the Court, its officers and their

25  families. The Class is defined as:

26      All citizens and residents of California who purchased Testosterone Complex in California for
their own personal or household use, and not for resale, from January 1, 2019 to the present.

27

28      94.    Questions of law and fact common to Plaintiff and the Class include:

    a.    Whether Defendant's conduct constituted a violation of the unfair prong of

16

California's Unfair Competition Law;

    b.   Whether Defendant's conduct constituted a violation of the unlawful prong of California's Unfair Competition Law;

    c.   Defendant's conduct constituted a violation of the fraudulent prong of California's Unfair Competition Law;

    d.   Whether Walgreens communicated efficacy messages through Testosterone Complex's labeling, packaging, and website

    e.   Whether those messages were material, or likely to be material, to a reasonable consumer;

    f.   Whether those messages were false, at variance with the truth, misleading, likely to deceive, and/or had the capacity to deceive the public and/or a reasonable consumer;

    g.   Whether Walgreens fraudulently omitted material information in advertising Testosterone Complex as safe and effective;

    h.   Whether Walgreens sold and distributed Testosterone Complex to the public in misleading packaging that was likely to deceive the public;

    i.   Whether Testosterone Complex is an unapproved new drug;

    j.   Whether Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers;

    k.   Whether the slight utility Defendant realized as a result of its conduct outweighs the gravity of the harm the conduct caused to its victims;

    l.   Whether Defendant's conduct violated public policy as declared by specific constitutional, statutory, or regulatory provisions;

    m.   Whether the injury to consumers from Defendant's practices is substantial;

    n.   Whether the injury to consumers from Defendant's practices is outweighed by benefits to consumers or competition;

    o.   Whether Class members are entitled to restitution;

    p.   Whether Class members are entitled to damages and/or punitive damages;

    q.   Whether Class members are entitled to an injunction and, if so, its terms; and

    r.   Whether Class members are entitled to any further relief.

95.    By purchasing Testosterone Complex, all Class members were subjected to the same wrongful conduct.

96.    Plaintiff's claims are typical of the Class's claims because all Class members were subjected to the same economic harm when they purchased Testosterone Complex and suffered economic injury.

97.     Plaintiff will fairly and adequately protect the interests of the Class, has no interests that are incompatible with the interests of the Class, and has retained counsel competent and experienced in class litigation.

98.     The Class is sufficiently numerous, as it includes thousands of individuals who purchased Testosterone Complex during the Class Period.

99.     Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small, as little as $32 for some Class members. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

100.    Questions of law and fact common to the Class predominate over any questions affecting only individual members.

## CAUSES OF ACTION

### First Cause of Action

### Unfair Competition Law, Unlawful Prong
### Bus. & Prof. Code §§ 17200, *et seq*.

101.    In this and every cause of action, Plaintiff realleges and incorporates the preceding allegations as if fully set forth herein.

102.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "unlawful" business acts and practices in that Defendant's conduct violates the California False Advertising Law, and the California Consumer Legal Remedies Act, as alleged herein.

103.    Walgreens leveraged its deception to induce Plaintiff and members of the Class to purchase products that were of lesser value and quality than advertised.

103.    The fraudulent marketing of Testosterone Complex described herein constitutes a violation of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

104.    Had Plaintiff known that Testosterone Complex was ineffective and offered for sale in violation of California and federal regulations, he would not have purchased it.

105.    Plaintiff suffered injury in fact and lost money or property as a result of Defendant's deceptive advertising: he was denied the benefit of the bargain when he decided to purchase Testosterone Complex over competing products, which are effective, legal, less expensive, and do not make misleading

18

1  or false drug claims on their packaging.

2  106.    Defendant's unlawful acts allowed it to sell more units of Testosterone Complex than it

3  would have otherwise, at a higher price, and higher margin.

4  107.    Had Plaintiff been aware of Defendant's false and misleading advertising tactics, he would

5  not have purchased Testosterone Complex, and had Defendant not advertised Testosterone Complex in a

6  fraudulent manner, Plaintiff would have paid less for it.

7  108.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining

8  Defendant from continuing to conduct business through unlawful, unfair, and fraudulent acts and

9  practices, requiring Defendant to commence a corrective advertising campaign, and awarding the class

10  restitution of all monies Defendant obtained from the sale of Testosterone Complex. Plaintiff has no

11  adequate remedy at law.

12  <u>**Second Cause of Action**</u>

13  **Unfair Competition Law, Fraudulent Prong**

14  **Bus. & Prof. Code §§ 17200,** *et seq***.**

15  104.    Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act

16  or practice."

17  105.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as

18  alleged herein constitute "fraudulent" business acts and practices in that Defendant's conduct has a

19  likelihood, capacity or tendency to deceive Plaintiff, the Class, and the general public.

20  106.    Defendant leveraged its deception to induce Plaintiff and members of the Class to purchase

21  products that were of lesser value and quality than advertised.

22  107.    Plaintiff and class members suffered injury in fact and lost money or property as a result of

23  Defendant's deceptive advertising: they were denied the benefit of the bargain when he decided to purchase

24  Testosterone Complex over competing products, which are legal, less expensive, and do not make

25  misleading or false drug claims on their packaging and websites.

26  108.    Had Plaintiff been aware of Defendant's false and misleading advertising tactics, he would

27  not have purchased Testosterone Complex, and had Defendant not advertised it in a fraudulent manner,

28  Plaintiff would have paid less for it.

109.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices; requiring Defendant to commence a corrective advertising campaign; and awarding the class restitution of all monies Defendant obtained from the sale of Testosterone Complex. Plaintiff has no adequate remedy at law.

<strong><u>Third Cause of Action</u></strong>

<strong>Unfair Competition Law, Unfair Prong</strong>

<strong>Bus. & Prof. Code §§ 17200, <em>et seq</em>.</strong>

110.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "unfair" business acts and practices because Defendant's conduct is:

- immoral, unethical, unscrupulous, and offends public policy;
- the gravity of Defendant's conduct outweighs any conceivable benefit of such conduct; and
- the injury to consumers caused by Defendant's conduct is substantial, not outweighed by any countervailing benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided.

111.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices; requiring Defendant to commence a corrective advertising campaign; and awarding the class restitution of all monies Defendant obtained from the sale of Testosterone Complex. Plaintiff has no adequate remedy at law.

<strong><u>Fourth Cause of Action</u></strong>

<strong>False Advertising Law</strong>

<strong>Cal. Bus. & Prof. Code §§ 17500, <em>et seq</em>.</strong>

112.    In violation of Cal. Bus. & Prof. Code §§ 17500 <em>et seq</em>., the advertisements, labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and use of Testosterone Complex without the knowledge that the product makes misleading and unapproved claims.

113.    Defendant knew and reasonably should have known that the claims made on Testosterone Complex's label, packaging, and website were untrue and misleading.

114.    As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable

1    relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

2    115.    Plaintiff seeks an order enjoining Defendant from continuing to conduct business through

3    unlawful, unfair, and fraudulent acts and practices; requiring Defendant to commence a corrective

4    advertising campaign; awarding Plaintiff and the class restitution of all monies from the sale of

5    Testosterone Complex in an amount of $5 million or a greater amount to be proven at trial, actual and

6    punitive damages, and interest to Plaintiff, an incentive award to Plaintiff in conjunction with a class award

7    or injunction, and for attorney fees and costs to be awarded by the Court in accordance with applicable law,

8    including the Private Attorney General Statute.

9                                **Fifth Cause of Action**

10                               **Consumer Legal Remedies Act**

11                               **Civil Code §§ 1750, *et seq*.**

12    116.    The CLRA prohibits deceptive practices in connection with the conduct of a business that

13    provides goods, property, or services primarily for personal, family, or household purposes.

14    117.    Defendant's policies, acts and practices were designed to, and did, result in the purchase

15    and use of Testosterone Complex for personal, family, or household purposes, and violated and continue

16    to violate the following sections of the CLRA:

17   • **Civil Code § 1770(a)(5),** representing that goods have characteristics, uses, or benefits
18      which they do not have;

19   • **Civil Code § 1770(a)(7),** representing that goods are of a particular standard, quality, or
        grade if they are of another;

20   • **Civil Code § 1770(a)(9)**, advertising goods with intent not to sell them as advertised; and

21   • **Civil Code § 1770(a)(16),** representing the subject of a transaction has been supplied in
22      accordance with a previous representation when it has not.

23    118.    As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable

24    relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

25    119.    As a further result, Plaintiff and the Class have suffered damages, and because the conduct

26    was deliberate, immoral, oppressive, made with malice and contrary to public policy, they are entitled to

27    punitive or exemplary damages.

28    120.    Pursuant to section 1782 *et seq*. of the CLRA, Plaintiff notified Defendant in writing by

certified mail of the particular violations of § 1770 of the Act as to Testosterone Complex and demanded

                                              21

that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.

121.    Defendant received Plaintiff's written notice on August 25, 2025 and refused to correct any of the violations described in Plaintiff's letter.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself, all others similarly situated, and the general public, prays for judgment against Defendant as follows:

a) An order confirming that this class action is properly maintainable as a class action as defined above, appointing Plaintiff Jason Ferguson and his undersigned counsel to represent the Class, and requiring Defendant to bear the cost of class notice;

b) An order requiring Defendant to pay $1,000 in restitution, damages, punitive damages, and interest to Plaintiff;

c) An order requiring Defendant to pay $5 million or a greater amount to be proven at trial in restitution, damages, and punitive damages to Class members, and $15,000 to Plaintiff as an incentive award, or such greater amount the Court deems fair and reasonable;

d) An order requiring Defendant to disgorge any benefits received from Plaintiff and its unjust enrichment realized as a result of its improper and misleading advertising, marketing, sale, and distribution of Testosterone Complex.

e) An Order declaring the conduct complained of herein violates the Unfair Competition Law;

f) An order requiring Defendant to cease and desist its deceptive, unconscionable, fraudulent, and unlawful practices;

g) An order requiring Defendant to engage in a corrective advertising campaign;

h) A temporary and permanent injunction prohibiting the conduct described in the Complaint;

i) An award of prejudgment and post judgment interest;

j) An award of attorney fees and costs of $500,000, or such greater amount the Court awards as fair and reasonable; and

k) Such other and further relief as this Court may deem just, equitable or proper.

## **NO JURY DEMAND**

Plaintiff does not demand a jury trial.

*Ferguson v. Walgreen Co.*, Case No. 3:25-cv-08299-JST
FIRST AMENDED CLASS ACTION COMPLAINT

DATED: December 9, 2025

Respectfully Submitted,

s/ Gregory S. Weston
**THE WESTON FIRM**
GREGORY S. WESTON

**Counsel for Plaintiff**

*Ferguson v. Walgreen Co.*, Case No. 3:25-cv-08299-JST
FIRST AMENDED CLASS ACTION COMPLAINT