AMIN WASSERMAN GURNANI, LLP
William P. Cole, Bar No. 186772
Matthew R. Orr, Bar No. 211097
Cole Kroshus, Bar No. 345790
515 South Flower St., 18th Floor
Los Angeles, CA  90071
Tel:    (213) 933-2330
Fax:    (312) 884-7352
wcole@awglaw.com
morr@awglaw.com
ckroshus@awglaw.com

Attorneys for Defendant Walgreen Co.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON FERGUSON, on behalf of himself and all others similarly situated,<br><br>            Plaintiff,<br><br>v.<br><br>WALGREEN CO.,<br><br>            Defendant. | Case No.:  4:25-cv-08299-JST<br><br>**DEFENDANT WALGREEN CO.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>Date: February 19, 2026<br>Time: 2:00 p.m.<br>Courtroom 6 |

1

## <u>NOTICE OF MOTION</u>

2    TO THE CLERK OF COURT AND ALL PARTIES OF RECORD:

3       PLEASE TAKE NOTICE THAT on February 19, 2026, at 2 p.m. or as soon thereafter as may be

4    heard by the Honorable Jon S. Tigar, Courtroom 6 – 2nd Floor, 1301 Clay Street, Oakland, California,

5    Defendant Walgreen Co. will, and hereby does, move the Court for an order dismissing the First

6    Amended Complaint, and each claim asserted therein, pursuant to Federal Rules of Civil Procedure

7    12(b)(6) and 12(b)(1). This motion is made on the ground that Plaintiff fails to state any claim for relief,

8    his claims are preempted by federal law, and he lacks standing to pursue injunctive relief. The grounds

9    for the motion are more fully set forth in the accompanying Memorandum of Points and Authorities.

10      This motion is based upon this Notice, the accompanying Memorandum of Points and Authorities,

11   the Declaration of Andrea Collaro (ECF Doc. 18-1), the Declaration of William P. Cole, the pleadings

12   and files in this action, and such other matters as may be presented at or before any hearing on this motion.

13

14   Dated:  December 23, 2025    **AMIN WASSERMAN GURNANI, LLP**

15

16             **/s/ *William P. Cole***

17             William P. Cole

18             *Attorneys for Defendant*

19

20

21

22

23

24

25

26

27

28

DEFENDANT WALGREEN CO.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1

## **TABLE OF CONTENTS**

2

3  STATEMENT OF ISSUES TO BE DECIDED ...................................................................... 1

4  MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 1

5  I.    INTRODUCTION ...................................................................................................... 1

6  II.   BACKGROUND ........................................................................................................ 2

7         A.    The Product's Packaging. ............................................................................... 2

8         B.    Alleged Online Advertising. ........................................................................... 4

9         C.    Ferguson's Alleged Purchases. ....................................................................... 5

10  III.  LEGAL STANDARDS ............................................................................................. 6

11  IV.   ARGUMENT ............................................................................................................. 7

12        A.    All Claims Predicated on the "Unapproved New Drug" Theory are Preempted by

13              Federal Law. ..................................................................................................... 7

14        B.    Besides Being Impliedly Preempted, Ferguson Fails to Plausibly Allege that the Product

15              Makes Any Disease Claims. .......................................................................... 10

16        C.    Ferguson Fails to Plausibly Allege that the Product's Advertising Claims are False or

17              Misleading. .................................................................................................... 14

18              1.    "Supports a healthy libido".................................................................. 15

19              2.    "Support sexual function" ................................................................... 16

20              3.    "Supports lean muscle mass, strength & endurance"........................... 16

21              4.    "Promotes an increase in free testosterone" ....................................... 17

22              5.    Ferguson fails to plausibly allege the Product is not "safe.".............. 19

23        D.    Ferguson Fails to State any Claim for Equitable Restitution Because He Fails to Plead

24              Facts Establishing His Legal Remedies Are Inadequate. ................................ 21

25        E.    Ferguson Lacks Standing to Pursue Injunctive Relief. .................................. 22

26  V.    CONCLUSION ........................................................................................................ 24

27

28

# TABLE OF AUTHORITIES

**State Cases**

*Nat'l Council Against Health Fraud, Inc. v. King Bio Pharm., Inc.*, 107 Cal.App.4th
1336 (2003) ..................................................................................................... 11, 14


**Federal Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)......................................................... 6, 18, 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)................................................... 6

*Bubak v. Golo, LLC*, No. 1:21-cv-00492-DAD-AC, 2024 WL 86315
(E.D. Cal. Jan. 5, 2024) ................................................................................... 9

*Bubak v. Golo, LLC*, No. 24-492, 2025 WL 2860044 (9th Cir. Oct. 9, 2025) ...... 8, 9, 10, 14

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) ............ 7, 8, 10

*Caldwell v. Nordic Naturals, Inc.*, 709 F. Supp. 3d 889 (N.D. Cal. 2024) ........ 24

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ............................................. 22

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)......................................... 23

*Dachauer v. NBTY, Inc.*, 913 F.3d 844 (9th Cir. 2019)........................ 10, 11, 14

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ..................................... 23

*Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018) ............. 23, 24

*DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35 (1st Cir. 2023) ......... 8, 9, 10

*Eckler v. Wal-Mart Stores, Inc.*, 2012 WL 5382218 (S.D. Cal. Nov. 1, 2012)........ 18

*Ferrari v. Vitamin Shoppe Indus. LLC*, 70 F.4th 64 (1st Cir. 2023) .................. 12

*Freund v. HP, Inc.,* No.22-cv-03794-BLF, 2023 WL 187506
(N.D. Cal. Jan. 13, 2023) .............................................................................. 22

*Gonzalez v. Chattem, Inc.*, No. 23-cv-00102-HSG, 2023 WL 8101923
(N.D. Cal. Nov. 21, 2023) ............................................................................ 22

*Gradney v. Polar Beverages*, No. 25-cv-02149, 2025 WL 2105831
(N.D. Cal. July 28, 2025) .............................................................................. 22

*Greenberg v. Target Corp.*, 985 F.3d 650 (9th Cir. 2021) ........................................ 12

*Guaranty Trust Co. of New York v. York*, 326 U.S. 99 (1945) .................................. 21

*In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541 (9th Cir. 1994) ................................... 6

*Jackson v. General Mills, Inc.*, No. 18cv2634-LAB (BGS), 2020 WL 5106652
    (S.D. Cal. Aug. 28, 2020) ........................................................................ 24

*Jones v. ConAgra Foods, Inc.*, 912 F.Supp.2d 889 (N.D. Cal. 2012) ....................... 7

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ................................. 6, 21

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)....................... 6, 7

*Kroessler v. CVS Health Corporation*, 977 F.3d 803 (9th Cir. 2022)................... 11, 12

*Kwan v. SanMedica Int'l*, 854 F.3d 1088 (9th Cir. 2017) ....................... 14, 17, 18, 20

*Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018 (9th Cir. 2003) .............. 23

*Liou v. Organifi, LLC*, 491 F.Supp.3d 740 (S.D. Cal. 2020) ................................. 14

*Loh v. Future Motion, Inc.*, No. 5:21-cv-06088-EJD, 2022 WL 2668380
    (N.D. Cal. July 11, 2022) ........................................................................ 21

*Magpayo v. Walmart Inc.*, No. 24-cv-01350-WHO, 2025 WL 754065
    (N.D. Cal. Mar. 10, 2025) ........................................................................ 20

*Nexus Pharmaceuticals, Inc. v. Central Admixture Pharmacy Services, Inc.*, 48 F.4th
    1040 (9th Cir. 2022) ........................................................................ 8, 9, 10

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ............................................................ 22

*Otto v. Abbott Laboratories, Inc.*, No. CV 12-1411-SVW, 2013 WL 12132064
    (C.D. Cal. Mar. 15, 2013)................................................................... 7, 18

*Padilla v. Costco Wholesale Corp.*, No. 11 C 7686, 2013 WL 195769
    (N.D. Ill. Jan. 16, 2013) ........................................................................ 18

*Perez v. Nidek Co., Ltd.*, 711 F.3d 1109 (9th Cir. 2013) .................................... 8, 10

*Ringler v. J.M. Smucker Company*, 783 F. Supp.3d 1229 (C.D. Cal. 2025)............... 23

*Sanford v. MemberWorks, Inc.*, 625 F.3d 550 (9th Cir. 2010)................................. 6

*Seegert v. Rexall Sundown, Inc.*, No. 20-55486, 2022 WL 301553 (9th Cir. 2022) ....... 11

TABLE OF AUTHORITIES

1    *Sneed v. Procter & Gamble Company*, No. 23-cv-05443-JST, 2024 WL 5384684

2      (N.D. Cal. Aug. 19, 2024) ................................................................................ 14

3    *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) ................................. 21, 22

4    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499 (2007) ............................ 6

5    *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ................................................ 6

6    *Viggiano v. Hansen Natural Corp.*, 944 F.Supp.2d 877 (C.D. Cal. 2013) .............................. 7

7    *Vigil v. General Nutrition Corp.*, No. 15cv0079, 2015 WL 8056178

8      (S.D. Cal. Dec. 4, 2015) ................................................................................ 18

9    **Statutes**

10    21 C.F.R. § 101 ........................................................................................ 11

11    21 C.F.R. § 310 ..................................................................................... 7, 13

12    21 U.S.C. § 321 ........................................................................................ 7

13    21 U.S.C. § 337 ........................................................................................ 8

14    21 U.S.C. § 343 ........................................................................................ 8

15    21 U.S.C. § 360 ........................................................................................ 8

16    65 Fed. Reg. 1000 ................................................................................... 11

17    65 Fed. Reg. at 1030 ............................................................................. 11, 12

18    65 Fed. Reg. at 1031 ................................................................................ 13

19    Cal. Bus. & Prof. Code § 1750 ........................................................................ 6

20    Cal. Bus. & Prof. Code § 17200 ....................................................................... 6

21    Cal. Bus. & Prof. Code § 17500 ....................................................................... 6

22    Fed. R. Civ. P. 8 ..................................................................................... 6

23    Fed. R. Civ. P. 9 .................................................................................. 6, 21

24    Fed. R. Civ. P. 12 .................................................................................... 6

25

26

27

28

TABLE OF AUTHORITIES

**STATEMENT OF ISSUES TO BE DECIDED PER CIVIL L.R. 7-4(A)(3)**

1. ***Preemption***. Whether federal law preempts Plaintiff's claims predicated on allegations that Walgreen violated the Food, Drug and Cosmetic Act ("FDCA") by allegedly marketing Walgreens Men's Testosterone Complex as an unapproved new drug.

2. ***Failure to Allege Falsity***. Whether Plaintiff has failed to allege factual content plausibly establishing that the Walgreens Men's Testosterone Complex does not provide its advertised benefits.

3. ***Equitable Restitution***. Whether Plaintiff has stated any claims for equitable restitution where the Complaint does not adequately allege that his legal remedies are inadequate.

4. ***Standing (Injunctive Relief)***. Whether Plaintiff adequately alleges standing to pursue injunctive relief.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Plaintiff Jason Ferguson challenges the advertising of the Walgreens Men's Testosterone Complex dietary supplement (the "Product"). He alleges that Walgreen makes "disease" claims for the Product that supposedly render it an "unapproved new drug." He also makes conclusory allegations that several of the Product's structure/function claims are false and misleading, and that the Product is not "safe." His claims fail as a matter of law.

First, the "unapproved new drug" theory is preempted. The Ninth Circuit has held that private parties cannot bring state law claims predicated on allegations that a defendant marketed or sold unapproved drugs in violation of the FDCA and, by adoption, California's Sherman Law. And even apart from preemption, Ferguson fails to identify any advertising that makes any disease claim whatsoever. The Product's packaging makes prototypical, acceptable structure/function claims.

Second, Ferguson fails to allege factual content plausibly showing that the Product's structure/function claims are false or misleading, let alone that the Product is not "safe." Ferguson makes a few generalized allegations about the testosterone-boosting industry writ large but not about the Product. And he cites studies *supporting* the Product's structure/function claims. His allegations meet neither the plausibility nor particularity requirements applicable to his claims.

/ / /

Third, Plaintiff does not adequately allege that his available legal remedies are inadequate. Therefore, he fails to state any claim for equitable restitution. He also fails to allege Article III standing to pursue injunctive relief.

Walgreen identified these defects in its prior motion to dismiss. Rather than oppose the motion, Ferguson filed his First Amended Complaint ("FAC"). But the FAC did not cure the defects and, for the most part, did not even try to do so. The Court should dismiss the First Amended Complaint ("FAC") in its entirety.

**II.    BACKGROUND**

    **A.    The Product's Packaging.**

Walgreen markets and sells the Product, which, as stated in the Supplement Facts panel, includes vitamin B6 (pyridoxine), magnesium, zinc, and Fenugreek extract (Testofen®). (Dkt. 20, FAC, ¶ 4.) The FAC includes the following images of the Product:



MEMORANDUM OF POINTS AND AUTHORITIES



(*Id.* ¶ 52; *see also* Decl. of Andrea Collaro ("Collaro Decl."), Dkt. 18-1, Ex. 1 (image of a complete carton).)[1]

As can be seen, the front of the carton and the bottle label prominently state that the Product is a "DIETARY SUPPLEMENT." (FAC ¶ 52.) In the "Suggested use" section, the carton again states the Product is "a dietary supplement." (*Id.*)  The front of the carton includes the express statement that "[T]HIS PRODUCT IS NOT INTENDED TO DIAGNOSE, TREAT, CURE, OR PREVENT ANY DISEASE" (the "DSHEA disclaimer"). (*Id.*) The DSHEA disclaimer is repeated on the back panel, as well as on the bottle's label, and every structure/function claim made on the carton and label is directly tied to the DSHEA disclaimers by an asterisk (*). (*See* Cole Decl., Ex. 6; Dkt. 18-1.) Despite all this, Ferguson alleges the Product is an "unapproved new drug" because Walgreen supposedly markets it with advertising claims that it "can cure, mitigate, or treat disease, such as low testosterone, hormonal

_____

[1] The full carton is properly considered by the Court under the doctrine of incorporation by reference, as explained in Section III, *infra*. The Declaration of Andrea Collaro is part of the record at ECF Docket number 18-1. For convenience, it is also attached as Exhibit F to the declaration of William Cole ("Cole Decl.").

imbalance, and sexual disfunction." (*Id.* ¶ 48.) But neither the Product's carton nor its label makes any reference to "low" testosterone, "hormonal imbalance", or "sexual dysfunction." (*See Id.* ¶ 52; Cole Decl., Ex. F; Dkt. 18-1.) The FAC does not identify any advertising that makes those statements.

Ferguson alleges that "Defendant claims that Testosterone Complex 'boost[s] free testosterone levels,' 'promotes an increase in free testosterone levels,' increases 'lean muscle mass, strength, & endurance,' and improves 'sexual function in men.' Walgreens further claims that the product 'has been clinically studied' and is 'Walgreens pharmacist recommended.'" (FAC ¶ 4.) But, again, Ferguson's allegations are contradicted by the advertising itself in certain ways, and he also omits the asterisks and other reference marks tied to the advertising claims.

First, the packaging does not state that the Product "increases" lean muscle mass, strength and endurance. (*Id.* ¶ 52.) Instead, it states "*Supports* . . . lean muscle mass, strength & endurance††*". (*Id.*, emphasis added.) The asterisk links to the DSHEA disclaimer and the †† reference mark links to the following language: "††As part of a 12-week regular strength and exercise program." (Cole Decl., Ex. F; Dkt. 18-1, Ex. 1.)

Second, the packaging does not state that the Product "improves" sexual function in men. (FAC ¶ 52; Cole Decl., Ex. F; Dkt. 18-1, Ex. 1.) Instead, the packaging states that one of the Product's ingredients (Testofen®) "has been clinically studied for its ability to . . . *Support* sexual function in men*‡". (*Id.*, emphasis added.) The asterisk links to the DSHEA disclaimer, while the ‡ reference mark ties to the statement "‡Related to a normal decrease associated with aging." (Cole Decl., Ex. F; Dkt. 18-1, Ex. 1.)

**B.    Alleged Online Advertising.**

Ferguson also makes allegations about the Product's online advertising on Walgreens.com. (*Id.* ¶ 47.) But the online statements identified by him are just a repeat of the same language found on the Product's carton. (*Compare* FAC ¶ 52 *with* Dkt. 20-1.) However, in the FAC, when recounting the structure/function claims found in the online advertising, Ferguson *omits* certain words. For example, the Walgreens.com Product page states, "Supports a healthy libido" not "healthy libido." (*Compare* FAC ¶ 57 *with* Dkt. 20-1.) The Product page states, "Supports Lean muscle mass, strength & endurance", but Ferguson drops "Supports" from his rendition of that structure/function claim in the FAC. (*Id.*) And the

- 4 -

Product page states "Promotes an Increase in Free Testosterone", but Ferguson omits the word "Promotes" from his rendition. (*Id.*) In any event, Ferguson does not allege that he viewed any online advertising before making his purchases.

### C.    Ferguson's Alleged Purchases.

Ferguson alleges that he purchased the Product "at least three times from the Walgreens locations on Market Street in San Francisco and on East Avenue in Chico." (FAC ¶ 82.) He alleges his most recent purchase was in December 2023. (*Id.*) He alleges that, when purchasing the Product, "he was seeking a safe and effective product which would increase testosterone levels, muscle mass, and libido, and which was sold in compliance with FDA regulations and California law." (*Id.* ¶ 87.) He alleges he "suffered economic injury when he purchased Testosterone Complex because the product was entirely ineffective for its intended purposes and was in violation of federal regulations and California law." (*Id.* ¶ 89.) He claims the Product "had a value of $0 because it is both illegal and ineffective." (*Id.* ¶ 91.)

As for the purported "illegality," Ferguson's theory is that the Product's advertising makes disease claims and "aphrodisiac" claims (rather than permissible structure/function claims) that render the Product an unapproved new drug under the FDCA and its implementing regulations. (*Id.* ¶¶ 50 - 51.) He alleges that because the Product is supposedly an unapproved new drug under the FDCA, it is also misbranded under California's Sherman Food, Drug, and Cosmetic Law (the "Sherman Law"). (*Id.* ¶ 73.)

As for Ferguson's theory the Product is "entirely ineffective" and "does not deliver the advertised benefits" (FAC ¶¶ 54, 90), his initial Complaint did not contain any factual content to support those conclusory assertions, as was explained in Walgreen's prior motion to dismiss. (Dkt. 18, pp. 13 – 16.) The FAC adds new allegations regarding only one of the Product's structure/function claims—i.e., whether the Product promotes an increase in free testosterone. (FAC ¶¶ 40 – 47.) The FAC does not include any new allegations regarding any of the Product's other structure/function claims (i.e., supports a healthy libido or supports lean muscle mass, strength and endurance).

Finally, in the initial Complaint, there were no factual allegations plausibly demonstrating that taking the Product as directed isn't "safe." Even though the prior motion to dismiss identified this defect (Dkt. 18, pp. 15-16), the FAC does not include any new factual allegations regarding the Product's safety.

1     The FAC brings the following claims on behalf of Ferguson and a proposed California class:

2    violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.

3    (First through Third Causes of Action); violation of California's False Advertising Law ("FAL"), Cal.

4    Bus. & Prof. Code § 17500, et seq. (Fourth Cause of Action); and violation of the Consumer Legal

5    Remedies Act ("CLRA"), Cal. Bus. & Prof. Code § 1750, et seq.

6   **III.**    **LEGAL STANDARDS**

7     The court must dismiss a claim if it fails to state a claim upon which relief can be granted. Fed.

8    R. Civ. P. 8. Rule 8 demands "more than an unadorned, the-defendant-unlawfully-harmed-me

9    accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted). The complaint must

10    state sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Bell*

11    *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility only if the plaintiff

12    pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

13    for the misconduct alleged. *Iqbal*, 556 U.S. at 678.

14     The court does not accept as true "legal conclusions," "labels and conclusions" or a "formulaic

15    recitation of the elements of a cause of action[.]" *Iqbal*, 556 U.S. at 678. A "naked assertion" devoid of

16    "further factual enhancement" does not suffice. *Id.* (citation omitted). The plaintiff must allege "more

17    than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint alleging facts "merely

18    consistent with the defendant's liability stops short of the line between possibility and plausibility" of

19    entitlement to relief. *Id.*

20     Furthermore, claims that sound in fraud must meet the heightened pleading standard of Federal

21    Rule of Civil Procedure 9(b). *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010). This

22    includes UCL, FAL, and CLRA claims. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).

23    Among other things, Rule 9(b) requires that the plaintiff "set forth what is false or misleading about a

24    statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)

25    (quoting *In re GlenFed, Inc. Sec. Litig,*, 42 F.3d 1541, 1548 (9th Cir. 1994)).

26     When ruling on a Rule 12 motion, a court may look beyond the pleadings at documents

27    incorporated by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct.

28    2499 (2007); *accord Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (internal

- 6 -

quotations and citation omitted). This includes the complete product labeling as well as the scientific studies referenced and relied upon in the FAC. *See, e.g., Jones v. ConAgra Foods, Inc.*, 912 F.Supp.2d 889, 903 n.7 (N.D. Cal. 2012) (product label properly considered "because it is referenced in the complaint"); *Viggiano v. Hansen Natural Corp.*, 944 F.Supp.2d 877, 882-883 (C.D. Cal. 2013) (same); *Otto v. Abbott Laboratories, Inc.*, No. CV 12-1411-SWV(DTB), 2013 WL 12132064, at *3 (C.D. Cal. Mar. 15, 2013) ("In examining these studies, which are incorporated by reference into the pleadings, the Court concludes that they fail to support a plausible claim for relief."). The incorporation-by-reference doctrine "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims." *Khoja*, 899 F.3d at 1002.

## IV.    ARGUMENT

Ferguson asserts two theories of liability: (1) that the Product is an unapproved drug under the FDCA and is therefore misbranded under the FDCA and the Sherman Law; and (2) that the challenged advertising claims are false and misleading because the Product "does not deliver the advertised benefits" and is not "safe."  (FAC ¶¶ 10, 54.) His UCL, FAL, and CLRA claims are all predicated on one or both of these theories. Walgreen addresses each in turn.

### A.    All Claims Predicated on the "Unapproved New Drug" Theory are Preempted by Federal Law.

Ferguson alleges that the Product's advertising claims render it "a 'drug' within the meaning of 21 U.S.C. § 321(g) and an aphrodisiac drug within the meaning of 21 C.F.R. § 310.528." (FAC ¶ 50.) Therefore, he alleges that Walgreen was required to obtain FDA approval to market the Product as a drug but did not do so. (*Id.* ¶ 51.) He alleges that, by extension, Walgreen violated the Sherman Law because it "adopted" the federal provisions. (*Id.* ¶ 73.) He asserts these alleged regulatory violations as a basis for his UCL "unlawful"-prong claim. (*Id.*) He also predicates his deception-based claims under the UCL, FAL, and CLRA on the "unapproved new drug" theory by alleging that he purchased the Product "with the natural assumption" that it "would be sold in compliance with FDA regulations and California law" and he "would not have purchased" it had he known it "was sold in violation of federal regulations and California law." (*Id.* ¶¶ 88, 90.) However, under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S.

341, 353 (2001), and *Nexus Pharmaceuticals, Inc. v. Central Admixture Pharmacy Services, Inc.*, 48 F.4th 1040, 1050 (9th Cir. 2022), the alleged FDA regulatory violations cannot serve as a predicate for any of his causes of action. Any claims predicated on the alleged regulatory violations are preempted.

In this context, preemption rests on two principles: (1) the FDCA preempts any state's drug regulations or food labeling requirements that are not identical to FDCA requirements (21 U.S.C. §§ 343-1, 360k); and (2) a consumer has no ability to privately enforce the FDCA. (21 U.S.C. § 337(a)-(b)). These two principles create only a "narrow gap" through which a private party's state-law claim must fit to escape preemption by the FDCA: The plaintiff must be suing for conduct that *violates* the FDCA (or else his claim is expressly preempted), but the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under *Buckman*). *Perez v. Nidek Co., Ltd.*, 711 F.3d 1109, 1120 (9th Cir. 2013).

The Ninth Circuit has held that private parties cannot bring state law claims predicated on allegations that the defendant marketed or sold unapproved drugs in violation of the FDCA and, by extension, the Sherman Act. *Nexus Pharmaceuticals, Inc. v. Central Admixture Pharmacy Services, Inc.*, 48 F.4th 1040, 1050-51 (9th Cir. 2022); *Bubak v. Golo, LLC*, No. 24-492, 2025 WL 2860044, at *1 (9th Cir. Oct. 9, 2025). In *Nexus*, like here, the plaintiff alleged that the defendant sold drugs without the FDA's approval, thereby violating the Sherman Law and, by extension, the UCL. *See* 48 F.4th at 1043; *see also Bubak*, 2025 WL 2860044, at *1 (explaining that, in *Nexus*, "the UCL claim in that case rested on alleged violations of the Sherman Law"). The Ninth Circuit held the plaintiff's claims were preempted because they were "based on state laws that incorporate federal law, rather than on traditional tort law." *Nexus*, 48 F.4th at 1048. "[A] necessary element of [the plaintiff's] claim is the alleged violation of the FDCA." *Id.* "The purported state law violation is of a law that says in substance 'comply with the FDCA,' not a traditional common law tort." *Id.* at 1050. Therefore, "[t]he prohibition of private enforcement applies squarely, as does 'implied preemption.'" *Id.* at 1050-51; *accord DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35, 42 (1st Cir. 2023) ("Because we conclude that violation of the FDCA '*is* a critical element in [DiCroce's] case,' we hold that her claims are impliedly preempted.") (emphasis and alteration in original, citation omitted).

In *Nexus*, the court explained that the Ninth Circuit has "been protective of the FDA's statutory

1    monopoly on enforcement authority." *Nexus*, 48 F.4th at 1048. Private causes of action predicated on

2    violation of a state statute "that says in substance 'comply with the FDCA'" are preempted because

3    they "may indeed 'stand as an obstacle' to FDA's enforcement discretion by enabling what the FDA

4    regards as over-enforcement." *Id.* at 1048, 1050.

5         Similarly, in *Bubak v. Golo, LLC*, No. 1:21-cv-00492-DAD-AC, 2024 WL 86315 (E.D. Cal.

6    Jan. 5, 2024), the plaintiff—like Ferguson here—filed a putative class action complaint predicating

7    UCL, FAL, and CLRA claims on the theory that the defendant made drug claims about its dietary

8    supplement product without premarket approval under the FDCA. *Id.* at *1. The district court held that

9    theory could not support any UCL, FAL, or CLRA claim because it was preempted under the Ninth

10   Circuit's binding precedent in *Nexus*. *Id.* at *3-4. The plaintiff appealed, and the Ninth Circuit recently

11   affirmed the dismissal. *Bubak*, 2025 WL 2860044 (9th Cir. Oct. 9, 2025). The panel held that *Nexus*

12   was controlling and foreclosed the plaintiff's claims. *Id.* at *1. The court explained: "Bubak's claims

13   face the same problem [as the claims in *Nexus*]. She asserts that she may sue under the UCL because

14   the FDCA is 'incorporated into' the Sherman Law and Golo violated § 403(r) of the FDCA by

15   representing that its dietary supplement can mitigate or prevent a disease." *Id.* Bubak's UCL claim

16   "therefore necessarily requires litigating 'the alleged underlying FDCA violation,' *Nexus*, 48 F.4th at

17   1049, and the 'plain text of the FDCA leaves that determination in the first instance to the FDA's

18   balancing of risks and concerns in its enforcement process.' *id.* at 1050." *Bubak*, 2025 WL 2860044,

19   at *1.

20        Similarly, in *DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35 (1st Cir. 2023), the plaintiff

21   alleged that, although marketed as a dietary supplement, Lactaid is actually an unapproved new drug

22   because the defendants allegedly advertised it as a treatment for lactose intolerance. *Id.* at 38. The

23   plaintiff alleged that because Lactaid is a drug under relevant federal laws, "it is misleading, and thus

24   violative of state law, for [defendants] to misbrand Lactaid as a dietary supplement, and to make

25   statements on Lactaid's label disclaiming [FDA] approval, thereby implying that FDA approval is not

26   required[.]" *Id.* The court affirmed the district court's dismissal of the complaint. The court observed

27   that the plaintiff's "legal action hinges on her assumption that Lactaid's labels violate the FDCA's

28   labeling requirements and are therefore misleading to consumers." *Id.* at 40. "Because we conclude

that violation of the FDCA '*is* a critical element in [DiCroce's] case,' we hold that her claims are impliedly preempted." *Id.* at 42 (quoting *Buckman*, 531 U.S. at 353).

Here, just as in *Nexus*, *Bubak*, and *DiCroce*, Ferguson cannot base any state-law claim on the theory that, although labeled as a dietary supplement, the Product is advertised in a way that renders it an unapproved drug under the FDCA. But that is exactly what Ferguson tries to do. (*See* FAC ¶¶ 50 – 51.) He attempts to predicate a UCL "unlawful"-prong claim on the unapproved drug theory, alleging that the purported FDCA violations are, by adoption, also violations of the Sherman Law and, therefore, the UCL (*Id.* ¶¶ 73 – 74.) As explained in *Nexus* and *Bubak*, any such claim is preempted.

As for his deception-based UCL, FAL, and CLRA claims, Ferguson's claims are also preempted to the extent predicated on his allegations that he was misled because he believed the Product was "sold in compliance with FDA regulations and California law" and would not have purchased it if he had known otherwise. (*Id.* ¶¶ 88, 90.) That theory would also require the court to determine if the Product is, in fact, an unapproved new drug marketed or sold in violation of the FDCA regulations (and, by extension, the Sherman Law). The claims therefore encroach on "the FDA's statutory monopoly on enforcement authority." *Nexus*, 48 F.4th at 1048. The Court must dismiss all claims—regardless of whether they are couched in terms of unlawfulness, unfairness, or deception— to the extent predicated on the underlying theory that the Product is an unapproved new drug.

**B.      Besides Being Impliedly Preempted, Ferguson Fails to Plausibly Allege that the Product Makes Any Disease Claims.**

While impliedly preempted, Ferguson's "unapproved new drug" theory fails for another reason: He fails to plausibly allege that Walgreen advertises the Product with any disease claims that would render it a "drug." Thus, his claims are also expressly preempted because he fails to plausibly allege conduct "that *violates* the FDCA." *Perez*, 711 F.3d at 1120 (emphasis in original, quotation and citation omitted).

For dietary supplements, the FDCA distinguishes between "disease claims" and "structure/function claims" that manufacturers make about their products. *Dachauer v. NBTY, Inc.*, 913 F.3d 844, 846 (9th Cir. 2019). "A structure/function claim 'describes the role of a nutrient or dietary ingredient intended to affect the structure or function in humans' or 'characterizes the

documented mechanism by which a nutrient or dietary ingredient acts to maintain such structure or function,' but 'may not claim to diagnose, mitigate, treat, cure, or prevent a specific disease or class of diseases.'" *Id.* (quoting 21 U.S.C. § 343(r)(6)) (emphasis in original). Conversely, a disease claim "claims to diagnose, mitigate, treat, cure, or prevent disease," either explicitly or implicitly, such as by claiming that a product treats a disease's "characteristics signs or symptoms." 21 C.F.R. § 101.93(g)(2); *see Dachauer*, 913 F.3d at 846.

Structure/function claims must meet three requirements: (1) the manufacturer has substantiation that the statement is truthful and not misleading; (2) the statement contains a prominent disclaimer that the FDA has not evaluated the statement and that the product "is not intended to diagnose, treat, cure, or prevent any disease"; and (3) the statement itself does not "claim to diagnose, mitigate, treat, cure, or prevent" disease. 21 U.S.C. § 343(r)(6). "Although the FDCA requires manufacturers to have substantiation for their structure/function claims, California law does not allow private plaintiffs to demand substantiation for advertising claims." *Dachauer*, 913 F.3d at 847 (citing *Nat'l Council Against Health Fraud, Inc. v. King Bio Pharm., Inc.*, 107 Cal.App.4th 1336 (2003)).

Statements that a dietary supplement will "support", "help maintain", "promote", or "boost" a structure or function of the human body—without any reference to preventing, treating, or curing a disease—are permissible structure function claims, not disease claims. *See* 65 Fed. Reg. 1000, 1030 (Jan. 6, 2000) ("FDA agrees that 'boosts stamina, helps increase muscle size, and helps enhance muscle tone' are acceptable structure/function claims, because they do not refer to any disease."). For example, in *Dachauer*, the court held that "support cardiovascular health" and "heart health" are structure/function claims. 913 F.3d at 846, 848. Similarly, in *Kroessler v. CVS Health Corporation*, 977 F.3d 803 (9th Cir. 2022), the court held that label claims such as "support joint comfort" and "supports flexibility" were structure/function claims, not implied disease claims. *Id.* at 806. The court noted the FDA's guidance distinguishing between a claim referring to "joint pain" and a claim "helps support cartilage and joint function," with the latter claim a permissible structure/function claim. *Id.* at 810; *see also Seegert v. Rexall Sundown, Inc.*, No. 20-55486, 2022 WL 301553, at *2 (9th Cir. 2022) ("supports joint comfort" and "helps strengthen joints" were structure/function claims, not implied disease claims, as the label "does not represent that [the product] 'reduces joint pain' or affects any

1  other characteristic symptom of osteoarthritis"); *Ferrari v. Vitamin Shoppe Indus. LLC*, 70 F.4th 64,

2  68 (1st Cir. 2023) ("supports the immune system" is a structure/function claim); *Greenberg v. Target*

3  *Corp.*, 985 F.3d 650, (9th Cir. 2021) (referring to "vitamin C boosts immunity" as an example of a

4  structure/function claim).

5      Here, the Product makes classic structure/function claims. It does not make any reference to

6  any disease or disease condition. Ferguson's claims to the contrary are not only implausible, but

7  frivolous. The front carton states, "Supports . . . A healthy libido*‡ [and] Lean muscle mass, strength

8  & endurance††*". (FAC ¶ 52; Cole Decl., Ex. F; Dkt. 18-1.) There is no reference to "treat[ing] low

9  testosterone, hormonal imbalance, [or] sexual dysfunction" (FAC ¶ 48), nor any reference to a disease

10  or disease condition. In fact, the asterisks lead directly to the front-of-package DSHEA disclaimer,

11  expressly stating the Product is *not* intended to diagnose, treat, cure, or prevent any disease. (*Id.* ¶ 52;

12  Cole Decl., Ex. F.) The ‡ symbol links the "supports healthy libido" claim to the statement, "‡Related

13  to a normal decrease associated with aging." (Cole Decl., Ex. F.) The †† symbol ties the "supports lean

14  muscle mass, strength & endurance" claim to "††As part of a 12-week regular strength training and

15  exercise program." (*Id.*) Again, there is no reference to any disease or disease condition. *See* 65 Fed.

16  Reg. at 1030 ("boosts stamina, helps increase muscle size, and helps enhance muscle tone" are

17  acceptable structure/function claims because they do not refer to any disease). Similarly, the back

18  panel's references to one of the Product's ingredients (Testofen®) having been clinically studied for its

19  ability to "[s]upport" the development of lean muscle mass, strength and endurance, and sexual function

20  in men are prototypical structure/function claims. *See Dachauer*, 913 F.3d at 846, 848 ("support

21  cardiovascular health"); *Kroessler*, 977 F.3d at 806 ("support joint comfort" and "supports

22  flexibility"). The packaging makes no reference to "erectile dysfunction" or "impotence." "Promoting"

23  an increase in free testosterone is also a structure/function claim, not a disease claim. The DSHEA

24  disclaimer appears right below these structure/function claims.

25      Likewise, Ferguson's conclusory assertion that the Product makes "aphrodisiac" claims is

26  meritless. The packaging never uses the word "aphrodisiac" and never refers to "arousing" or

27  "increasing" sexual desire. Instead, as noted, the structure/function claims merely refer to *supporting*

28  healthy libido related to a normal decrease associated with aging and *supporting* sexual function.  And

while the Product does not even refer to "arousing" or "increasing" sexual desire, even it had the FDA has determined that, with respect to dietary supplements, "'arouses or increases sexual desire and improves sexual performance' is *an acceptable structure/function claim* because it does not imply treatment of a disease." 65 Fed. Reg. at 1031 (emphasis added). In contrast, the FDA observed that "'[h]elps restore sexual vigor, potency, and performance,' 'improves performance, staying power, and sexual potency,' and 'builds virility and sexual potency' are disease claims because they use the term 'potency,' which implies treatment of impotence, a disease. If, however, these claims made clear that they were intended solely for decreased sexual function associated with aging, they could be acceptable structure/function claims." 65 Fed. Reg. at 1031.

In short, Ferguson's "aphrodisiac" drug claim theory reveals a deep misunderstanding of FDA regulations pertaining to dietary supplements. His reliance on 21 C.F.R. § 310.528 is misplaced. That section concerns OTC drugs, not dietary supplements. In fact, section 310.528 was enacted before the passage of the Dietary Supplement Health and Education Act of 1994, which established a new regulatory framework for dietary supplements. The FDA has specifically addressed this distinction, explaining the FDA agrees that some "OTC drug claims may be acceptable structure/function claims" for dietary supplements. 65 Fed. Reg. at 1031. As noted, the FDA gave examples of such acceptable structure/function claims with respect to sexual desire or performance. *Id.* Here, the Product's advertising stays well within the realm of permissible structure/function claims for a dietary supplement by merely referring to *supporting* healthy libido and *supporting* sexual function (related to a normal decrease associated with aging), and not making any reference to impotency, potency, or erectile dysfunction. There is no question the Product's packaging makes basic structure/function claims, not disease or "aphrodisiac" drug claims.

The FAC cites a handful of FDA warning letters, but they are red herrings. They concern products that the FDA warned were unapproved drugs (not dietary supplements) either because they did not include a dietary ingredient, they made claims regarding erectile dysfunction or impotence, or they included active pharmaceutical ingredients found in prescription drugs. *See* FAC, Dkt. 20-1, Ex. 2 (FDA warning the products were not dietary supplements because their ingredients (e.g., piracetam and ATD) are not dietary ingredients), Dkt. 20-1, Ex. 3 (the products were advertised as treatment for

1  "erectile dysfunction" and "a remedy for impotence"), Dkt. 20-1, Ex. 4 (the products included anabolic

2  steroids, not dietary ingredients), Dkt. 20-1, Ex. 5 (the product contained sildenafil, the same active

3  pharmaceutical ingredient in Viagra, a prescription drug), Dkt. 20-1, Ex. 6 (the product contained

4  tadalafil, the same pharmaceutical ingredient in Cialis, a prescription drug). Ferguson's reliance on

5  those warning letters is befuddling. He does not allege that the Product does not contain dietary

6  ingredients. He does not allege any Product advertising that refers to erectile dysfunction or impotency.

7  He does not allege that the Product contains an active pharmaceutical ingredient found in FDA-

8  approved prescription drugs.

9      Having failed to plausibly allege an FDCA violation, Ferguson's state-law claims attempt to

10  impose requirements that are "not identical to" FDCA requirements. *Bubak*, 2025 WL 2860044, at *1

11  (quoting 21 U.S.C. § 343-1). Thus, he fails to state any UCL, FAL, or CLRA claim predicated on the

12  theory that the Product is an "unapproved new drug."

13      **C.    Ferguson Fails to Plausibly Allege that the Product's Advertising Claims are False**

14          **or Misleading.**

15      Apart from Ferguson's "unapproved new drug" theory, the FAC includes boilerplate assertions

16  that the Product "does not deliver the advertised benefits." (FAC ¶ 54.) "California law does not allow

17  private plaintiffs to demand substantiation for advertising claims." *Dachauer*, 913 F.3d at 847 (citing

18  *King Bio*, 107 Cal.App.4th 1336). Instead, a private plaintiff bears the burden of proving "that the

19  challenged statement is false or misleading." *Id.* at 847. "Because California law does not provide a

20  private cause of action for claims that advertising lacks substantiation, the failure to allege specific facts

21  pointing to actual falsehood constitutes a fatal flaw." *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096-97

22  (9th Cir. 2017); *see also Liou v. Organifi, LLC*, 491 F.Supp.3d 740, 750 (S.D. Cal. 2020) ("In the false

23  advertising context, an advertising claim is false if it has 'actually been disproved,' that is, if the plaintiff

24  can point to evidence that directly conflicts with the claim." (citation and quotation omitted)). In *Kwan*,

25  the Ninth Circuit affirmed dismissal of CLRA and UCL claims where the plaintiff failed to adequately

26  allege specific facts establishing a dietary supplement's advertising claims were "actually false" (rather

27  than unsubstantiated). *Id.* at 1098; *see also Sneed v. Procter & Gamble Company*, No. 23-cv-05443-JST,

28  2024 WL 5384684, at *8 (N.D. Cal. Aug. 19, 2024) (granting motion to dismiss where scientific studies

- 14 -

cited in the complaint did not plausibly establish the advertising claim was false or misleading, observing: "Plaintiffs cannot allege that P&G has made false or deception statements, then cite materials that do not actually demonstrate" the alleged falsity).

In its prior motion to dismiss, Walgreen explained that Ferguson had failed to plead factual content supporting his conclusory allegations that the Product doesn't provide its advertised benefits. (Dkt. 18, pp. 13 – 16.) As discussed below, the FAC does not cure the defects.

### 1.    "Supports a healthy libido"

The Product's carton states "Supports: A healthy libido*‡". (FAC ¶ 52.) The FAC does not contain any factual content even attempting to plausibly show that the Product does not support a healthy libido. The FAC does not cite any scientific article or study concluding that the Product as a whole, its ingredient Testofen® (Fenugreek Extract, *Trigonella foenum-graecum*), or its other ingredients do not help support a healthy libido.

To the contrary, the FAC incorporates by reference Steels, et al., *Physiological Aspects of Male Libido Enhanced by Standardized Trigonella foenum-graecum Extract and Mineral Formation*, Phytotherapy Res. 25: 1294-1300 (2011) (the "Steels Study"), a randomized clinical trial in which the treatment group was administered Testofen®, magnesium, zinc, and pyridoxine[2] for six weeks, while another group received placebo for the same period. (FAC ¶ 42 & n.8; Cole Decl., Ex. A.) The Steels Study "was designed to evaluate the effects of a formulation containing the Testofen® brand of *Trigonella foenum-graecum* extract combined with magnesium, zinc and pyridoxine on healthy males with low libido without sexual dysfunction." (Cole Decl., Ex. A at p. 1295.) The study "demonstrated that there was a significant improvement in sexual function and performance following treatment with the active treatment" and "a small reduction in performance for people treated with the placebo." (*Id.* at p. 1299.) The authors concluded: "This clinical trial has demonstrated that *Trigonella foenum-graecum* extract powder was efficacious in enhancing male libido in healthy adult males with normal testosterone, prolactin and PSA levels. In particular, positive changes were observed in the physiological aspects of libido." (*Id.* at p. 1229.)

In sum, the FAC does not cite any study plausibly establishing that the Product does not support

---

[2] The Product also contains Testofen®, magnesium, zinc, and pyridoxine. *See* FAC ¶ 52; Cole Decl., Ex. F.

- 15 -

MEMORANDUM OF POINTS AND AUTHORITIES

1    a healthy libido but instead cites a study supporting this structure/function claim. The Court should
2    dismiss any claims predicated on the "supports a healthy libido" advertising claim.

3                            **2.    "Support sexual function"**

4    The FAC misconstrues this structure/function claim, alleging that Walgreen advertised that the
5    Product "improves" sexual function in men. (FAC ¶ 4.) In fact, neither the Product's packaging nor the
6    walgreens.com Product page states that the Product "improves" sexual function. Rather, the advertising
7    states that "Testofen® has been clinically studied for its ability to: . . . Support sexual function in men*‡."
8    (FAC ¶ 52; Cole Decl., Ex. F.) In any event, just as with the "supports a healthy libido" claim, Ferguson
9    not only fails to plead any factual content plausibly establishing the "support sexual function" claim is
10   false or misleading but manages to plead evidence *supporting* this structure/function claim. The Steels
11   Study reported that their clinical trial "demonstrated that there was a significant improvement in sexual
12   function and performance following treatment with the active treatment [i.e., Testofen, magnesium, zinc,
13   and pyridoxine]." (Cole Decl., Ex. A at p. 1299.) Ferguson fails to state any claims predicated on the
14   "support sexual function" advertising claim.

15                   **3.    "Supports lean muscle mass, strength & endurance"**

16   The Product's carton states: "Supports: . . . Lean muscle mass, strength & endurance†† *" (with
17   the †† linked to the statement, "As part of a 12-week regular strength training and exercise program").
18   (FAC ¶ 52; Cole Decl., Ex. F.) Again, the FAC makes no attempt to plead any factual content
19   demonstrating this structure/function's claim is false or misleading. Instead, the FAC pleads scientific
20   studies *supporting* this structure/function claim. Ferguson incorporates by reference Poole, et al., *The*
21   *effects of a commercially available botanical supplement on strength, body composition, power output,*
22   *and hormonal profiles in resistance-trained males*, J. Int. Soc. Sports Nutrition 2010, 7:34 (the "Poole II
23   Study"). (*See* FAC ¶ 45 & n. 11.) The purpose of this study "was to evaluate the effects of Fenugreek
24   supplementation on strength and body composition." (Cole Decl., Ex. B at p. 1.) Subjects were randomly
25   assigned to a treatment group or a placebo group. The treatment group ingested 500 mg of Fenugreek
26   (*Trigonella foenum-graecum*) per day. (*Id.*)[3] Both groups participated in a supervised 4-day per week
27   periodized resistance-training program for 8 weeks. (*Id.*) "The study was conducted as a double-blind,

28

---

[3] The Walgreen Product contains 600 mg of Fenugreek extract per daily serving. (FAC ¶ 52.)

MEMORANDUM OF POINTS AND AUTHORITIES

placebo-controlled trial using parallel groups matched according to total body weight. The independent variable was the nutritional supplement *Trigonella foenum-graecum*." (*Id.*) The study reported "a significant increase in lean body mass" for the Fenugreek group at week 4 and 8, and no such changes were seen in the placebo group. (*Id.* at p. 5.) The study also reported significant increases in bench press and leg press beyond those experienced in the placebo group. (*Id.* at p. 7.) "The major findings of this study suggest that ingesting 500 mg of a commercially available botanical extract [Fenugreek] for eight weeks in conjunction with a structured resistance training program can significantly impact body composition and strength in resistance trained males when compared with placebo." (*Id.* at p. 6.)

The FAC also incorporates Poole, et al., *Effects of TESTOSURGE supplementation on strength, body composition and hormonal profiles during an 8-week resistance training program*, J. Int. Soc. Sports Nutrition 2009, 6(Suppl. I): P12 (the "Poole I Study"). (*See* FAC ¶ 44 & n. 10.) The Poole I Study concluded that Fenugreek supplementation "significantly impacted body fat percentage, total testosterone, and bioavailable testosterone when compared to placebo in a double-blind fashion." (Cole Decl., Ex. C at p. 1.) The Fenugreek supplementation also resulted in a significant effect for bench press and leg press. (*Id.*)

Again, it is Ferguson's burden "to allege specific facts pointing to actual falsehood." *Kwan*, 854 F.3d at 1096-97. Because the FAC does not plead any factual content plausibly establishing that the Product does not support lean muscle, strength, or endurance, the Court should dismiss all claims to the extent predicated on that advertising claim.

### 4. "Promotes an increase in free testosterone"

That leaves only the structure/function claim "promotes an increase in free testosterone." In the initial Complaint, Ferguson merely made allegations about the "testosterone boosting" industry in general, alleging "that '[n]inety percent of 'T booster' supplements claimed to boost [testosterone],' and of these products, just '24.8% of these had data to support these claims.'" (Dkt. 1 ¶ 16, citation omitted.) He alleged that "limited human studies have evaluated T-Boosters, resulting in no definitive findings of efficacy[.]" (Dkt. 1 ¶ 20, quotation and citation omitted.) As pointed out in Walgreen's prior motion to dismiss, these allegations do nothing for Ferguson, as he does not allege at all (much less plausibly or with particularity) that the Product was one of those studied or whether it fell within the 24.8% that "had

MEMORANDUM OF POINTS AND AUTHORITIES

data to support the claims." (Dkt. 1 ¶ 16.) Furthermore, whether a product has "data to support the claims" or whether there are "definitive findings of efficacy" merely concerns whether there is *substantiation*, not whether an efficacy claim is "actually false." *See Kwan*, 854 F.3d at 1098.

In the FAC, Ferguson repeats verbatim these same, defective general "industry" and lack-of-substantiation allegations. (FAC ¶¶ 16 – 22.) And while the FAC adds citations to a handful of studies for the purported proposition that Fenugreek supplementation does not promote an increase in free testosterone. (FAC ¶¶ 42 – 47), those studies stop far short "of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678.

The Poole I and Poole II studies involved only 500 mg of Fenugreek extract, not magnesium, zinc, or pyridoxine. (*See* Cole Decl., Exs. B, C.)[4] The Bushey, et al. study—cite in paragraph 26 of the FAC—also involved only 500 mg of Fenugreek extract. (Cole Decl., Ex. D.) In contrast, the Product is a finished product containing a serving size of 600 mg Fenugreek extract, 9.8 mcg pyridoxine, 32 mg magnesium, and 30 mg zinc. (FAC ¶ 52.) Citation to scientific articles does not magically establish plausibility: "the essential inquiry depends upon a comparison of the match 'between the representations at issue and the evidence that allegedly debunks them.'" *Vigil v. General Nutrition Corp.*, No. 15-cv-0079-JM, 2015 WL 2338982, at *11-14 (S.D. Cal. May 13, 2015) (collecting cases) (quoting *Eckler v. Wal-Mart Stores, Inc.*, 2012 WL 5382218, at *7 (S.D. Cal. Nov. 1, 2012)). Where there is a "mismatch between the representations at issue and the evidence that allegedly debunks them," the plaintiff fails to state a plausible claim. *Eckler*, 2012 WL 5382218, at *7 (granting motion to dismiss). Courts grant motions to dismiss where the studies concerned only one or two ingredients contained in a multi-ingredient product. *See, e.g., Vigil v. General Nutrition Corp.*, No. 15cv0079, 2015 WL 8056178 (S.D. Cal. Dec. 4, 2015) (granting motion to dismiss); *Padilla v. Costco Wholesale Corp.*, No. 11 C 7686, 2013 WL 195769, at *3 (N.D. Ill. Jan. 16, 2013) (granting motion to dismiss where the plaintiff's complaint cited scientific studies concerning only one ingredient in the supplement); *Otto v. Abbott Laboratories, Inc.,* No. CV 12-1411-SVW, 2013 WL 12132064, at *14 (C.D. Cal. Mar. 15, 2013) (granting motion to dismiss, observing: "[T]he Products contain a blend of several proteins and vitamins in addition to HMB.

---

[4] As for the Fenugreek extract ingredient, one of the Poole studies used an extract known as TESTOSURGE, not the Testofen® extract. (Cole Decl., Ex. C.) The other Poole study does not clarify what Fenugreek extract was used and does not claim it was Testofen®.

1    Therefore, the fact that HMB alone might not affect healthy individuals does not logically imply that the

2    Products' specific combination of ingredients is similarly ineffectual."). The Poole I, Poole II, and

3    Bushey studies, which concern only 500 mg of Fenugreek extract raise only a speculative *possibility* that

4    a finished supplement containing 600 mg Fenugreek extract, magnesium, zinc, and pyridoxine may not

5    promote an increase in free testosterone.[5] That falls far short of the plausibility standard. Tellingly, the

6    FAC nowhere disputes that magnesium, zinc, and pyridoxine all have crucial structure/function roles in

7    testosterone production and/or regulation.

8         The Steels Study (FAC ¶ 42) also does plausibly establish that the "promotes an increase in free

9    testosterone" is false or misleading. While the Steels Study used a multi-ingredient formula substantially

10   similar to the Product, the study's aim was to determine the effects on male libido, not free testosterone.

11   (Cole Decl., Ex. A at p. 1295.) As noted, the study concluded the formulation was "a well tolerated

12   naturally derived product to use to support libido in healthy males." (*Id.* at p. 1299.) The Steels Study did

13   not test for free testosterone. In fact, the study's *only* reference to free testosterone is its observation that

14   a prior double-blind study demonstrated that Fenugreek extract "had a positive effect on anabolic activity

15   (as evidence by BUN reduction) as well as significant increase in free testosterone." (*Id.* at p. 1295.) The

16   Steeles Study reported changes in *serum testosterone levels*. (*Id.* at pp. 1295, 1299.) But the FAC does

17   not (and cannot allege) that serum testosterone is the same as free testosterone. The FAC fails to plausibly

18   allege that the Product does not promote an increase in free testosterone.

19              **5.        Ferguson fails to plausibly allege the Product is not "safe."**

20        Finally, Ferguson makes a conclusory assertion that the Product isn't safe. (FAC ¶ 9.)[6] This

21   reckless assertion is made without any plausible factual allegations to support it. In *Dachauer*, the Ninth

22   Circuit explained that a structure/function claim could be misleading if using the dietary supplement at

23   the recommended dose increases the risk of disease. 913 F.3d at 849. "In other words, if a supplement's

24   label recommends taking one capsule per day, and that dose actually increased the risk of death – a

25   _____

26   [5] Ferguson cites Mulhall, et al. for its reference to a study regarding "reduced levels of free testosterone."
     (FAC ¶ 47.) But the study cited by Mulhall is just the Bushey study cited in paragraph 43 of the FAC.
     (*See* Cole Decl., Ex. E.)

27   [6] The FAC only vaguely references safety. In FAC ¶ 10, Ferguson alleges he purchased the Product "with
     the belief that the product was safe" but then in FAC ¶ 11, he just alleges the Product "failed to deliver
28   the advertised benefits" (not that it was unsafe). In an abundance of caution, Walgreen addresses the
     vague safety allegations.

1    material fact 'with respect to consequences which may result from use of the article' – the FDA would
2    deem it misleading not to reveal that fact on the label." *Id.*

3        Ferguson, however, does not allege factual content plausibly showing that taking the
4    recommended dose of the Product increases the risk of disease or death. The Complaint does not allege
5    any testing or scientific studies which, if true, would establish that taking the Product as recommended
6    increases the risk of disease or death. This failure "constitutes a fatal flaw." *Kwan*, 854 F.3d at 1096-97.
7    Ferguson merely makes speculative allegations about the "testosterone booster" market generally. (FAC
8    ¶ 23.) He alleges that consumption of "'natural' or 'herbal' purported testosterone boosters present
9    significant health risks." *Id.* He doubles down on that conclusory assertion with another conclusory one:
10    "consumers risk purchasing a product that will endanger their health." *Id.* These conclusory assertions
11    are not tied to the Product by any factual allegations. The FAC does not contain any discussion of the
12    Product's ingredients and its recommended dose vis-à-vis any purported risk of disease or death.

13        Ferguson references a single case study of one patient who used a "natural" testosterone booster
14    and later experienced clot formation. (FAC ¶ 24.) Ferguson himself admits that the case report described
15    the "risk of venous thromboembolic events" as "*unclear* with non-FDA-approved herbal supplements
16    marketed as testosterone enhancers." (*Id.*, emphasis added.) Ferguson also provides no allegations
17    regarding ingredient dosages contained in the *unidentified* herbal supplement involved in that single case
18    report, let alone any comparisons between those unidentified doses in that unidentified product, on the
19    one hand, and the Product at issue here, on the other. *See Magpayo v. Walmart Inc.*, No. 24-cv-01350-
20    WHO, 2025 WL 754065, at *4 (N.D. Cal. Mar. 10, 2025) (dismissing Complaint where "plaintiff has
21    failed to allege and cite evidence in support that taking omega-3 fish oil supplements *at the level the*
22    *Products recommend* increases the risk of atrial fibrillation") (emphasis in original).

23        Ferguson also refers to the FDA issuing a warning in 2014 "about the significant risk of venous
24    clots secondary to testosterone product use." (FAC ¶ 24.) But Ferguson fails to note that the warning
25    concerned *prescription testosterone* products, not dietary supplements (much less the Product).
26    (https://www.fda.gov/drugs/drug-safety-and-availability/fda-drug-safety-communication-fda-cautions-
27    about-using-testosterone-products-low-testosterone-due). And even then, he fails to note that the FDA
28    subsequently concluded: "Based on FDA's review of the results from a large clinical trial showing the

1    use of testosterone therapy did not increase the risk of heart attack or stroke compared to an inactive

2    treatment called a placebo, we are removing information about this risk from the *Boxed Warning* on all

3    prescription testosterone products." (*Id.*)

4        Also, the clinical studies cited by Ferguson himself, and incorporated in the FAC, reported no

5    safety concerns with Fenugreek extract supplementation. (Steels Study, Cole Decl., Ex. A at p. 1299

6    ["There were no adverse events recorded during the clinical trial" and the supplement was "well

7    tolerated"]; Poole I Study, Cole Decl., Ex. C at p. 1 [benefits were obtained "without any clinical side

8    effects].)

9        When filing the FAC, Ferguson did not amend the complaint in any way with respect to his

10   conclusory safety allegations, even though Walgreen's prior motion to dismiss raised this obvious defect.

11   The Court should dismiss any claims based on the theory that using the Product isn't safe.

12       The CLRA, UCL, and FAL all require not only plausible but particularized factual allegations

13   showing that the challenged advertising is false or misleading to reasonable consumers. *See Kearns*, 567

14   F.3d at 1125 (Rule 9(b) applies to CLRA and UCL claims); *Loh v. Future Motion, Inc.*, No. 5:21-cv-

15   06088-EJD, 2022 WL 2668380, at *6 (N.D. Cal. July 11, 2022) (where the plaintiff's UCL, CLRA and

16   other claims relied on the same that the defendant misrepresented the product features, all claims were

17   subject to Rule 9(b)). For the reasons set forth above, Ferguson has failed to adequately allege the

18   Product's advertising is false or misleading. And his UCL "unfair"-prong claim is predicated on the same

19   invalid "unapproved drug" and false/misleading theories. His CLRA, UCL, and FAL claims fail as a

20   matter of law.

21       **D.    Ferguson Fails to State any Claim for Equitable Restitution Because He Fails to**

22           **Plead Facts Establishing His Legal Remedies Are Inadequate.**

23       Ferguson fails to state a valid claim for equitable restitution. He seeks damages under his CLRA

24   claim (FAC ¶ 119) and equitable restitution under all his causes of action. (*Id.* ¶¶ 108 (p.19[7] – UCL

25   unlawful), 109 (UCL fraudulent), 111 (UCL unfair), 115 (FAL), 118 (CLRA).) But before he can avail

26   himself of a federal court's equitable jurisdiction, he must demonstrate that he lacks an adequate remedy

27   at law. *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 105-06 (1945); *Sonner v. Premier Nutrition*

28   ─────────────
[7] The FAC contains a paragraph numbering error. On page 19, the paragraph numbering reaches 108 and
then restarts at 104.

*Corp.*, 971 F.3d 834, 842-44 (9th Cir. 2020). Both Supreme Court and Ninth Circuit case law require a plaintiff to plead facts establishing legal remedies are inadequate. *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974) (holding that a complaint seeking equitable relief failed because it did not allege "the inadequacy of remedies at law"); *Sonner*, 971 F.3d at 844 ("[T]he operative complaint does not allege that Sonner lacks an adequate legal remedy."); *accord Gonzalez v. Chattem, Inc.*, No. 23-cv-00102-HSG, 2023 WL 8101923, at *9 (N.D. Cal. Nov. 21, 2023); *Freund v. HP, Inc.,* No.22-cv-03794-BLF, 2023 WL 187506, at *6 (N.D. Cal. Jan. 13, 2023). To plead facts establishing inadequate legal remedies, a plaintiff must make certain showings. If the allegations show that "the scope of the claim for legal damages does not materially differ from that of the claim for restitution," then Ferguson has failed to carry his burden. *Gradney v. Polar Beverages*, No. 25-cv-02149, 2025 WL 2105831, at *9 (N.D. Cal. July 28, 2025).

Here, Ferguson's equitable restitution claims must be dismissed for at least two reasons. First, his boilerplate allegations about inadequate legal remedies all violate the general pleading requirement that prohibits courts from accepting legal conclusions. Courts do not accept as true "legal conclusions," "labels and conclusions" or a "formulaic recitation of the elements of a cause of action[.]" *Iqbal*, 556 U.S. at 678. A "naked assertion" devoid of "further factual enhancement" does not suffice. *Id.* (citation omitted). His sole allegation is that "Plaintiff has no adequate remedy at law." *See, e.g.* FAC ¶¶ 109, 111. Absent any factual allegations to support this legal conclusion, the Court must dismiss his claims for equitable restitution.

Second, the scope of Ferguson's legal claims and equitable claims cover the same conduct and are based on the same theories of alleged "unlawfulness" and deception. He does not allege any facts showing that the scope of the claim for legal damages differs "from that of the claim for restitution." *Gradney*, 2025 WL 2105831, at *9. To the contrary, he alleges the Product "had a value of $0" and he requests the same amount of money as damages and restitution. (FAC ¶ 90 & p. 22, line 11.) The Complaint fails to allege "how the same amount of money for the exact same harm is inadequate or incomplete[.]" *Sonner*, 971 F.3d at 845.

### E.    Ferguson Lacks Standing to Pursue Injunctive Relief.

To have standing to seek injunctive relief, the plaintiff must show he is likely to suffer future injury from the defendant's conduct. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). The

MEMORANDUM OF POINTS AND AUTHORITIES

threatened future injury "must be *certainly impending* to constitute injury in fact, and . . . allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal citations omitted) (emphasis added). This certainly impending injury must be as to the named plaintiff personally, not to some other consumer or putative class member. *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003). Ferguson bears the burden to establish standing for his injunctive relief claim. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 & n.3 (2006); *Ringler*, 783 F. Supp. 3d at 1246.

In *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018), the court held that "[a] previously deceived consumer may have standing to seek an injunction against false advertising or labeling" if she can *plausibly* allege the threat of future harm. 889 F.3d at 969-70. *Davidson* involved a plaintiff who purchased wipes advertised as "flushable." *Id.* at 961. The plaintiff alleged the "flushable" claim was false and misleading. The court held the plaintiff could allege standing for injunctive relief because when she encountered the product again, she would have no way of knowing whether the product had been improved—i.e., whether the wipes were truly flushable—without purchasing and using them. *Id.* at 972.

This case is not *Davidson*. Ferguson does not plausibly allege that he faces any "certainly impending" threat of future injury. *Clapper*, 568 U.S. at 409. Ferguson alleges that the claims made on the Product label "are misleading, as none of the ingredients in Testosterone Complex, either individually or in combination, can increase testosterone levels or strength or improve sexual performance." (FAC ¶ 49.) As Ferguson himself alleges, these ingredients are expressly disclosed on the Product's packaging. (*Id.* ¶ 52.) Unlike the plaintiff in *Davidson*, Ferguson does not need to purchase the Product and use it before knowing if it provides the advertised benefits.

In similar circumstances, courts routinely dismiss injunctive relief claims for lack of standing. In *Ringler v. J.M. Smucker Company*, 783 F. Supp.3d 1229, 1235036 (C.D. Cal. 2025), for example, the plaintiff alleged that the "natural" claim on Smucker's fruit spreads was false because the products contained citric acid. The court found the plaintiff had failed to allege standing to seek injunctive relief. *Id.* at 1247-1248. "[B]y simply looking at the ingredients label, Plaintiff can uncover whether the Product contains citric acid and avoid purchasing it." *Id.* at 1247-1248. This distinguished the case from

*Davidson*, where the plaintiff "had no way of determining whether future representations would be true." *Id.* at 1247. The court collected cases dismissing injunctive relief claims for lack of standing where, under the plaintiff's own theory of the alleged deception, the plaintiff could readily check the veracity of a label claim simply by looking at the information on the label. *Id.*; *see also Caldwell v. Nordic Naturals, Inc.*, 709 F. Supp. 3d 889, 911 (N.D. Cal. 2024) (distinguishing *Davidson*, finding that "the Plaintiff need not purchase the product to confirm the meaning and veracity of the label"); *Jackson v. General Mills, Inc.*, No. 18cv2634-LAB (BGS), 2020 WL 5106652, at *5 (S.D. Cal. Aug. 28, 2020).

Ferguson does not face any certainly impending threat of future injury. He faces no uncertainty and can avoid future injury simply by looking at the Product's packaging to see if it still makes the claims that he alleges render it an unapproved drug, and to see that the ingredients have not changed. The Court must dismiss any claim for injunctive relief.

## V.    CONCLUSION

Walgreen requests that the Court grant the Motion to Dismiss in its entirety. As Ferguson already had an opportunity to amend and failed to correct the defects, the dismissal should be without leave to amend.

Dated:  December 23, 2025          **AMIN WASSERMAN GURNANI, LLP**

/s/ *William P. Cole*
William P. Cole

*Attorneys for Defendant Walgreen Co.*

1

2

### **CERTIFICATE OF SERVICE**
(United States District Court)

3

4

     I hereby certify that on the 23rd day of December, 2025, I caused the electronic filing of the foregoing document**,** through the CM/ECF system. The aforementioned document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

5

6

7

8

9

10

                  /s/ *William P. Cole*
                  William P. Cole

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28